UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

ANDREA WOODWARD, *et al.*,  :
        Plaintiffs,  :

       vs.  :  No. 3:10-cv-01060

CITY OF GALLATIN, *et al.*,  :  Report of Kenneth R. Wallentine
        Defendants.  :

                                :

      The following report of Kenneth R. Wallentine is submitted after review of the following

documents, pleadings, records, and reports:

      Complaint

      Defendants' Responses to Plaintiff's Discovery Requests

      Gallatin Police Department Internal Investigation Report

      Deposition of Kate Novitsky

      Deposition of Bill Vahldiek

      Deposition of William Sorrells

      Deposition of Willis Ballard

      Deposition of Kris Ford

      Deposition of Chris Shockley

      Deposition of James Perry

*Woodward v. City of Gallatin, et al.*
*Report of Kenneth R. Wallentine*       1

Deposition of Mark Hill

Deposition of Sandra Rutter (Volumes 1 & 2)

Deposition of Andrea Woodward

Photographs of Jeffry Woodward post-mortem examination

Photographs of search warrant service

Video recording with TASER® discharge synchronized

Video recordings from in-car cameras (Sergeant Shockley, Officer Hill, Officer Ford, Officer Alvis)

Gallatin Police Department historical use of force records

Gallatin Police Department historical use of force analyses

Gallatin Police Department Annual Reports, 2007-2011

Gallatin Police Department Use of Force policy and training materials

Gallatin Police Department Police Service Dog policy

Gallatin Police Department in-service training records for 2009

TASER ® curriculum, V. 14.0

Recording of Lashawn Hill complaint

Tennessee Minimum Standards for Local Correctional Facilities

Tennessee Peace Officer Standards & Training Commission Rules

Selected witness interview audio recordings

Report by Ernest Burwell

Kenneth R. Wallentine states as follows:

1.      In the instant matter, I have relied upon the documents, diagrams, pleadings, records, reports, and statements previously described.  I have formed a number of opinions based upon the aforementioned, as well as my experience, education, and familiarity with professional publications.  I have relied on a variety of professional publications, including, but not limited to, my own publications and court decisions cited therein.  Those opinions, and a brief summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows:

a.      **Brief summary of the background of the complaint.**

Jeffry Woodward ("Woodward") called 9-1-1 on October 27, 2009, and reported that his mother, Sandra Rutter, was being held hostage in her home at ███████████ Gallatin, Tennessee.  Woodward told the dispatcher that there were two black men who had entered the home and who were holding his mother.  At about the same time that Woodward called 9-1-1, another caller (calling from ███████████) reported that a man came to his home and told the caller that someone was in his house and then ran away.

Gallatin Police Department Officers Hill and Ford found Woodward at Long Hollow Pike, near Trail Drive.  Sergeant Shockley and Officers King and Alvis went to the Rutter-Woodward home at ███████████.  Thus, the officers' efforts were initially divided into an investigation unfolding at two different locations.  The initial primary focus was ensuring Ms. Rutter's safety at ███████████.  Ms. Rutter told officers that Woodward made the emergency call and that she was not, in fact, the victim of a home invasion.  She told the officers

that Woodward had been using drugs, including a recent methamphetamine binge, and that he had been acting bizarrely.

At the same time, Officer Hill was speaking Woodward a short distance away. Officer Hill was assigned as a police service dog handler and he had his canine partner Alex in the car with him. Woodward had a large knife in his hand, which he discarded upon seeing Officer Hill. Woodward told Officer Hill that three black men invaded his home and kidnapped his mother.

Officer Ford arrived at that point to back up Officer Hill. He drove Woodward back to ███████████████ for further investigation. Although Woodward appeared to be possibly intoxicated, and he was somewhat agitated, officers reported nothing beyond the emotional agitation that one might expect to see in the victim or witness of a home invasion and kidnapping. So, Woodward was not handcuffed or placed under arrest before being transported to his mother's house.

Once Officers Ford and Hill arrived at ██████████████ and spoke with the other officers, the officers decided to arrest Woodward for public intoxication and a false emergency call. Officer Hill handcuffed Woodward while he was still seated in Officer Ford's car. Officer Ford needed to remain at the Rutter-Woodward home to continue his investigation, so the officers decided to move Woodward into Officer Perry's car for transportation to the jail. Woodward complied with Officer Hill's request to get out of the car and he calmly replied to a question about needles. Woodward showed no signs of a medical emergency or violent resistence.

Officer Perry began to search Woodward prior to placing him in the car, telling Woodward to "let me pat you down real quick, bud." Shortly after Officer Perry touched him and

without apparent reason, Woodward instantly became enraged and quickly became combative. Woodward claimed that Officer Perry had placed something into Woodward's pocket and Woodward began to struggle. The officers warned Woodward to calm down or be subjected to a TASER deployment. Woodward pulled away. Officer Hill deployed a TASER X26 in probe mode to Woodward's back.

Woodward bolted from the officers and ran into a shallow, grass-lined ditch. He stumbled, rose and ran again, breaking the TASER wires. Officers were shouting commands at him, telling him to stop and to relax. Woodward ran toward Officer Hill's patrol car and he jumped up onto the hood and windshield. He rolled to the right side of the patrol car. Officers Hill and Perry tried to control Woodward by taking him to the ground. Each officer deployed a TASER X26 to Woodward in the touch mode. Officer Perry pressed against Woodward to try to hold him down.

The TASER touch mode deployments appeared to have no effect. Woodward was able to powerfully arch his body and toss Officer Perry aside and knock Officer Hill's TASER from his hand. Officer Hill's police service dog, Alex, saw the struggle. Alex was able to push open the center door of the car kennel, jump out the front passenger window from Officer Hill's patrol car and run up to Woodward. Alex bit Woodward, prompting some compliance from Woodward. Woodward continued to struggle against the officers' control attempts. Officer Hill commanded Alex to move to a bark and hold position and Officers Perry and Ford tried to control Woodward. Officers Hill and Ford independently requested that the dispatcher send emergency medical assistance to the scene.

As Officer Ford stood Woodward up, Woodward threw himself toward the patrol car window. Officers Perry and Ford again placed Woodward on the ground to maintain ground control. Woodward banged his head into the pavement. Sergeant Shockley directed the officers to move Woodward to the grass so that Woodward could not strike his head on the pavement. Officer Perry placed Woodward into a sitting position. Woodward continued to thrash around and yell.

Emergency medical technicians arrived. They conducted a medical assessment, with generally unremarkable findings noting some minor bruising and lacerations and confusion. Woodward bit at the emergency medical technicians and was somewhat uncooperative with their efforts to assess him. He told them "heart attack." They placed Woodward into an ambulance to take him to the Sumner Regional Medical Center. En route to the medical center, Woodward showed signs of cardiac distress. Woodward subsequently died at the Medical Center. Post mortem analysis showed that he had methamphetamine and amphetamine in his blood at the time of his death.

b.    **Gallatin Police Department officers' detention of Woodward was consistent with actions of reasonable, well-trained officers and was consistent with generally accepted police policies, practices and training.**

1.    Woodward reported a home invasion and kidnapping to the emergency dispatcher. When the officers learned from Sandra Rutter (Woodward's mother) that she was *not* the victim of a home invasion and kidnapping, the officers knew that there was probable cause for an officer to believe that Woodward had committed one or more violations of Tenn. Code Ann. § 39-16-502, False Reports. A well-trained

officer would know that violation of this statute is a felony upon which a warrantless arrest may be made under Tennessee law.

2.  The officers had reason to believe that Woodward was under the influence of illegal drugs to a degree that he could endanger himself or others and that he was in a public place. Thus, the officers also knew that there was probable cause for an officer to believe that Woodward had committed a violation of Tenn. Code Ann. § 39-17-310, Public Intoxication.

3.  A reasonable and well-trained officer would have arrested Woodward for violation of these statutes. An arrest would not only have resolved the crisis initiated by Woodward's drug binge and call for emergency assistance, but would have also begun the judicial process that is often effective in helping users of illegal drugs obtain addiction treatment and maintain sobriety. At the time that Woodward was arrested, he was not in apparent mental health crisis. He was possibly experiencing some delusions. However, the officers had no reason to believe that any delusions would not abate with detoxification period in jail. Experienced officers learn that arresting and charging a person with a crime usually places the person in a much safer environment where the person can detoxify and be temporarily restricted from further drug and alcohol abuse. Tennessee jail standards require medical screening upon admission to the jail and require that appropriate medically-trained staff members be present in the facility at all times and that physician-level care be available for emergencies. Tennessee jails are subject to annual inspection to ensure compliance with these standards.

4. An arrest and jail detention is not always the sole possible resolution for a subject contacted by police. Officers are trained that some incidents initiated as a call for police intervention in an alleged crime may be best resolved by referral for mental health services. As I reviewed the Gallatin Police Department historical reports for incidents involving a use of force by an officer, I noted cases in which a subject was not arrested and booked into jail, but was transported for mental health evaluation and treatment. Even an arrest and jail detention may lead to a mental health referral. There are, however, many circumstances where even a person known to be suffering from mental illness should be arrested and booked into a jail.

5. The Gallatin Police Department provides training to its officers on the subject of emotionally-disturbed persons and how to best deal with such persons, whether by arrest and incarceration or citation or by other disposition. The Department required officers to attend in-service training in the months preceding the event with Woodward. The Gallatin Police Department also provided training on dealing with persons possibly experiencing excited delirium, as part of the TASER user certification training.

6. When Woodward was first contacted by Officer Hill, Woodward was holding a large knife. As the investigation progressed and officers learned that Woodward was falsely claiming that his mother had been kidnapped, the officers should have been increasingly concerned that Woodward had, at least initially, a large knife and the inherent threat to public safety posed by Woodward's behavior. This fact

would further prompt a reasonable and well-trained officer to arrest Woodward and book him into the jail.

c. **Gallatin Police Department officers used appropriate control techniques, including proper deployment of an electronic control device, to detain Woodward.**

1. Once the decision to arrest Woodward was made, Officer Hill placed handcuffs on Woodward as he was seated in Officer Ford's patrol car. Officers are taught in basic police training that an arrestee should be handcuffed with the arrestee's arms to the rear. Handcuffing Woodward was an essential task related to the arrest that a reasonable, well-trained officer would perform substantially contemporaneously with making the decision to arrest him.

2. Woodward was generally cooperative with the officers up to the point of moving from Officer Ford's patrol car into Officer Perry's car for transportation to the jail. It is routine and common for officers to arrest a person, handcuff the arrestee and place the arrestee in the nearest and most convenient police car. Sometimes that means placing an arrestee in a police car with a detention cage or screen. It is also routine and common for police officers to transfer an arrestee from one police car to another when one officer is no longer needed at the scene and is available to transport the arrestee. This allows officers to divide necessary tasks and to most efficiently and expeditiously complete the investigation. Taking the arrestee from the scene to the detention facility expedites the booking and assessment process, thereby allowing the arrestee to more quickly receive needed services and to post bail, be transferred to a mental health facility or to secure a no-bail supervised

release in appropriate cases. Removing the arrestee from the scene is a step in allowing the neighborhood to return to normal, and often makes it easier for investigating officers to gather evidence and interview potential witnesses. Officer Ford needed to continue his investigation at the scene, so the officers agreed to move Woodward into Officer Perry's car for transportation to the jail. This move was something that a reasonable and well-trained officer would do in the course of assisting other officers and recognizing the economies of movement and necessities of investigative responsibility. Prior to the move, Woodward had given no indication of combativeness.

3.  Police officers are trained to take personal responsibility for their safety and to take steps to detect contraband that might be stashed in a police car during transport and/or tools or devices that could be used to defeat handcuffs during transport. Officer Perry's request that Woodward cooperate with Officer Perry's effort to frisk him prior to transporting Woodward in the patrol car was a common and essential safety precaution. A reasonable and well-trained police officer would search any arrestee that the officer intended to transport in his patrol car.

4.  When Woodward started to twist and turn away from Officer Perry's request that he bend over and resisted Officer Perry's effort to pat him down, Officer Perry used physical control techniques to attempt to control Woodward. Officer Perry took Woodward's arm in a firm grip. Officer Perry described Woodward's powerful physical pull away from Officer Perry as comparable to "trying to pull a vehicle." Officer Perry tried to take Woodward to the ground, but was not able to

do so because of Woodward's physical force. Officers are taught that prone control generally facilitates maximum control for resistive subjects. When a subject is actively resisting an officer, prone control is nearly always superior to standing control techniques. These physical control techniques, although not entirely successful, were consistent with techniques and tactics that a reasonable and well-trained officer would use. These physical control techniques are commonly taught to police officers and are commonly used in making arrests.

5.  As Officer Perry was struggling to control Woodward, Officer Hill considered using the TASER X26® to help subdue Woodward. He warned Woodward to relax or face having the TASER deployed on him. Use of an electronic control device, such as the TASER X26 device, is often indicated in cases of a non-compliant subject who demonstrates a willingness to hurt himself or others. Electronic control devices may provide, under appropriate circumstances, reasonable alternatives to force options that present other risks in the particular circumstances. None of the known contraindications for use of the TASER X26, such as an obvious pregnancy, notably low body mass, or a flammable environment, were presented by Woodward. Other than possible drug intoxication, Woodward did not appear to be physiologically impaired in any way; to the contrary, he appeared to be very physically strong and powerful as he resisted the officers' physical attempts to control and secure him. Deployment of the TASER X26 was a viable and reasonable option to assist in controlling Woodward.

6.   Unlike most other force options, the TASER electronic control device does not
     depend exclusively on pain to achieve compliance, although the subject generally
     reports pain.  The pain and the subject's unfamiliarity with the sensation may
     distract the subject.  The TASER electronic control device relies on loss of
     neuromuscular control and the ability to perform coordinated action.  When
     discharged from a distance, the TASER X26 uses compressed nitrogen gas to
     propel two probes which are attached to the X26 by thin wires measuring
     approximately 127 microns, thinner than some human hair.  If both probes make
     contact with a person, closing the electrical circuit, the X26 delivers an electric
     current through the wires into the person.  If the wires are broken or the probes
     are pulled out, no current is delivered and a loud arcing sound may be heard.  The
     TASER electronic control device is designed to override the person's central
     nervous system and override the person's volitional neuromuscular control.  The
     X26 delivers short, shaped electrical pulses lasting 100 microseconds, delivering
     19 pulses per second for the first two seconds, and then dropping to 15 pulses per
     second while discharging.  Each operation of the X26 delivers approximately 400
     volts average (1,200 peak volts), contrasted to as much as 100,000 volts
     experienced in a strong static electricity shock.  The TASER discharge produces a
     current of 0.00021 amperes into the person's body over the duration of the
     TASER discharge, or approximately 21/100,000ths of the same amperage of the
     current required to light a single small Christmas tree bulb.  The X26 defaults to a

five second discharge for each discharge, although the device operator can manually stop or manually extend the cycle.

7.    Plaintiff's expert's claims that the TASER X26 delivers 50,000 volts to the subject's body are false. Even though such myths are occasionally casually repeated by some media sources, no research or data has ever been produced to substantiate such claims. To the contrary, independent research by numerous government, university and medical investigators has repeatedly debunked this myth.

8.    Officers are taught that the general safety of the TASER electronic control device has been well-documented in dozens of peer-reviewed medical and safety studies, as well as the deployment history in numerous public safety agencies. Summaries and conclusions of many of these studies were included in the curriculum for TASER training that Officer Hill completed. The United States Department of Justice and the United States Department of Defense are among the many government institutions and universities' studies whose independent, peer-reviewed research and analysis has supported the general safety of electronic control devices. Officers are taught that there have been well-over 2,860,000 TASER applications on humans. During a very few of those applications, persons have been injured. On very rare occasions, persons have died after grappling and struggling with the police officers who deployed the TASER to assist in capturing and controlling them. However, officers are also taught that there has never been

a death that has been scientifically or medically demonstrated to have been caused

by the application of the TASER device.

9.    The TASER electronic control device has a strong history of significantly reducing

injuries in law enforcement force applications and in preventing the necessity of

more injurious force options, including deadly force.  For example, through my

work on behalf of the City of Phoenix Police Department (one of the ten largest

police departments in the United States and a city which issues electronic control

devices to most officers) and the Maricopa County Sheriff's Office, I am

personally familiar with a 67% decrease in suspect injuries and a 54% reduction in

deadly force uses in a single year.  Through my work on police policies for the City

of New Orleans Police Department, I am personally familiar with a 90% decrease

in officer injuries in a two-year period and a 27% reduction in use of excessive

force complaints in a three-year study.   I have studied research that demonstrates

that the use of an electronic control device is far less injurious than other

non-lethal force options.  In the course of my teaching and research, I have studied

the injury rates and use of force tool effectiveness rates of over a dozen major

police departments using electronic control devices.  Each one reported a

reduction in injuries.  As electronic control device use increased in departments,

the use of more injurious options, such as impact rounds, baton strikes, chemical

sprays, dog bites and take downs, decreased and corresponding injury rates

decreased.  Officers are taught that the TASER device is a viable alternative to

other force options that is both safe and is likely to reduce injuries to officers and the persons that the officers are attempting to control.

10. A consequence of a discharge of an electronic control device may be that the subject falls to the ground. Woodward fell to the grass contemporaneously with the initial TASER energy cycle, though it is not certain that the TASER deployment contributed to the fall. Significant injuries from such falls are very unlikely. An epidemiological study conducted by physician researchers at Wake Forest University, Virginia Commonwealth University, Louisiana State University and the University of Nevada, and published by the American College of Emergency Physicians, of approximately 1,000 cases of individuals taken into custody following the use of an electronic control device showed a significant injury rate of 0.5% and a head injury rate (sufficiently serious to require medical treatment) of 0.2%. The large majority of falls, 99.7% of the cases, resulted in no injury or only in minor abrasions or contusions, as was the apparently the case with Woodward. This extremely low rate of significant injuries is consistent with my observation of electronic control device use in the field and in my studies of law enforcement agencies' use of force reports.

11. One report frequently cited in police TASER training was issued by the Police Executive Research Forum ("PERF"). Plaintiff's expert cites PERF findings in his report. PERF concluded that police departments that deploy electronic control devices in patrol divisions experience improved safety outcomes on six of nine safety measures, including reductions in officer injuries (70% reduction), suspect

injuries (40% reduction), suspect severe injuries, officers receiving injuries requiring medical attention, suspects receiving injuries requiring medical attention, and suspects receiving an injury that resulted in their being sent to a hospital or other medical facility. Similar studies from comparably well-known police research groups are frequently discussed in TASER user training.

12. Officers Hill and Perry were certified to use the TASER X26 at the time of this incident. They were trained to generally-accepted professional training standards and were required to complete the examination prescribed by TASER International and that is in use in thousands of law enforcement agencies in the United States, Canada, several other nations and in the United States military services. Officer Hill had successfully completed TASER X26 training and passed an examination with a score of 100% on April 23, 2009. Officer Perry had successfully completed TASER X26 training and passed an examination with a score of 100% on April 9, 2009.

13. Officer Hill gave Woodward several warnings that a TASER would be used if Woodward would not stop resisting. Warnings prior to deploying a TASER are not always tactically sound, but in this case warnings were appropriate. A reasonable and well-trained officer would have given warnings prior to deploying the TASER device and Officer Hill provided clear and loud warnings.

14. The deployment of the TASER, first by Officer Hill and then by Officer Perry, was a wise option in this circumstance. Woodward presented a threat to himself and/or others at the time that the officers were trying to control him. The TASER

was a low-risk option that is prescribed for use in circumstances such as those that the officers then faced.

14. I am aware that the Gallatin Police Department does not unqualifiedly prohibit the deployment of a TASER device on a handcuffed subject. I am generally familiar with the State of California police learning domain workbooks cited by plaintiff's experts, including those superceded and replaced. I am also generally familiar with the report of various committees, including the Canadian commission and the Amnesty International opinion cited. In my discussion of the deployment of the TASER in this case, I am relying on generally-accepted police training, practices and procedures and Tennessee police training and practices, as well as the training and policies of the Gallatin Police Department.

16. A reasonable and well-trained officer would not deploy a TASER device, or any other electronic control device, on a handcuffed subject who is cooperative, compliant and not attempting to resist arrest and control or to escape. A reasonable and well-trained officer would recognize that a handcuffed subject can still be a danger to himself and others.

17. In my work of drafting policies addressing the deployment of TASER and other electronic control devices–policies adopted and in use by hundreds and hundreds of large and small, urban and rural police and sheriffs' agencies in the United States–I have noted that the use of an electronic control device on subjects who are handcuffed or otherwise restrained should generally be avoided unless the totality of the circumstances indicates that other available options reasonably

appear ineffective or would present a greater danger to the officer, the subject or others, and the officer reasonably believes that the need to control the subject outweighs the risk of using the device. There are, however, circumstances presented in electronic control device training for officers that teach officers the option of deploying a TASER or similar device when a subject is handcuffed. Police training scenarios include discussion of using an electronic control device to stop assaultive or combative actions by a handcuffed subject, to stop a handcuffed subject from fleeing, to prevent a handcuffed subject from swallowing a harmful substance or contraband, and to prompt a handcuffed subject to get off the ground and/or to get into a police car.

18.  Officers Hill and Perry recognized that Woodward continued to be a threat to himself and/or to others even after he was handcuffed and that he was deliberately and determinedly resisting efforts to control him and complete the arrest. A reasonable and well-trained officer, even recognizing that Woodward was handcuffed, would have used a TASER or similar device to attempt to control Woodward.

19.  Officer Hill energized the TASER twice in probe mode. Each cycle was an effort to control Woodward and stop Woodward's resistence and escape efforts. The first cycle (deployed in probe mode) may not have had much, if any, effect on Woodward. Though Woodward fell forward, he was running in the grassy ditch and was handcuffed. His balance was likely impaired. The second cycle had no apparent effect and did not result in neuromuscular incapacitation. The loud

arcing sound that was recorded is highly indicative that the circuit was not
completed, meaning that no energy was applied to Woodward at that time.

20.    Both Officer Hill and Officer Perry applied TASER devices in touch mode.  Each
application was intended to control Woodward and stop Woodward's resistence
and escape efforts.  At the time of each discrete energy cycle, Woodward was
actively resisting control efforts and actively trying to escape from the officers by
twisting, kicking at the officers, pulling away from the officers and running from
the officers.  A reasonable and well-trained officer would have used a TASER or
similar device to attempt to control Woodward at each point that Officer Hill and
Officer Perry pulled the TASER trigger and caused an energy cycle to discharge.

d.    **The police service dog bite was unintended and was not commanded by Officer Hill
(the dog's handler).  The police service dog bite was the result of trained service dog
behavior.  If there had been a command to the police service dog to apprehend and
engage Woodward, such a command would have consistent with actions of a
reasonable well-trained police service dog handler and consistent with generally
accepted police policies, practices and training.**

1.    Police service dogs are commonly trained to protect the handler without being
given a specific command to do so when the dog perceives that the handler is
being attacked.  Sometimes even the best police service dogs will engage a subject
struggling with the dog's handler and the dog may not disengage or release even
upon a verbal command.  This is due to the inherent conflict between the service

dog's training to obey the handler's verbal commands and the service dog's

training and instinct to protect the handler.

2.      A police service dog trained in patrol/apprehension work (including handler

protection) that perceived Woodward's actions toward and near Officer Hill could

well respond with an instinctive and a trained protection behavior. Alex was

apparently determined to reach his handler, having opened the kennel door on his

own. Officer Hill did not intend to deploy Alex to control Woodward and he did

not intend that Alex bite Woodward.

3.      Alex got out of the car and bit Woodward on the leg (police service dogs will

generally bite the area presented). Such bites cause pain, but usually do not

involve significant injury. Officer Hill immediately recognized that Alex had bitten

Woodward. Officer Hill removed Alex from Woodward and commanded

Alex–who obeyed immediately–into a guard position. Officer Hill thus acted

consistent with the actions of a reasonable and well-trained police service dog

handler in minimizing Woodward's exposure to a dog bite and in controlling the

service dog so that he did not engage Woodward again without command.

4.      The Gallatin Police Department police service dog policy, GPD General Order

400.34, provides:

> Handler Protection and Apprehension: Each K-9 will be trained to be
> aggressive and demonstrate pronounced willingness to apprehend by
> gripping suspects on command of the handler and without command if the
> handler is being assaulted. The K-9 Unit will use only necessary force in
> situations in which the K-9 would be permitted to apprehend by gripping.
> The K-9 will be permitted to apprehend in certain circumstances. These
> circumstances include, but are not limited to:
> a.      In the pursuit of any known or suspected fleeing felon;

> b.  In the pursuit of any fleeing person known to have committed a serious misdemeanor;
>
> c.  *Any person who forcefully resists law enforcement; or*
>
> d.  Any person who commits a crime and attempts to elude capture by hiding in buildings, structures, or other terrain.

This policy is consistent with police service dog policies approved for use throughout the nation and is consistent with well-established principles articulated in *Graham v. Connor*, 490 U.S. 386 (1989).

5.  The decision to deploy a police service dog to apprehend a suspect should be the responsibility of the dog handler familiar with the particular abilities of the individual police service dog and considering the reported facts that are known at the time of deployment.  Such decisions are necessarily often made in tense, uncertain, and rapidly unfolding situations, and with limited information available and uncertain confirmation of that information.  This was the case at the time that Officers Hill and Perry were struggling to control Woodward.

6.  Officer Hill had the following information at the time that police service dog Alex bit Woodward:

   a.  Woodward had committed one or more felony violations of Tenn. Code Ann. § 39-16-502, False Reports.

   b.  Woodward had been armed with a large knife when Officer Hill first saw him.

   c.  Woodward had not been carefully searched for weapons before moving him to Officer Perry's car.

d.   Woodward was forcefully and actively physically resisting efforts to control him and complete the arrest and transportation.

e.   Woodward was exhibiting great strength, like "pulling against a car."

f.   Woodward posed a threat himself, to the public and to officers as he fought with the officers and increased his physical resistence and lack of control.

g.   Other efforts and techniques to control Woodward were not effective. The TASER did not cause neuromuscular incapacitation and was described as "ineffective." The two officers were not able, with all their physical strength, to control Woodward despite the handcuffs.

h.   Woodward was becoming increasingly determined to escape from the arrest.

7.   Provided with the same information that was reported to or observed by Officer Hill, a reasonable and properly trained police service dog handler would have recognized that deploying a police service dog to apprehend Woodward and bring him under control was consistent with generally accepted policies, practices and training for police service dog teams.

e.   **Gallatin Police Department officers properly monitored Woodward during his detention and appropriately facilitated medical care for Woodward.**

1.   Police officers deal with emotional and agitated persons on a frequent basis. Few calls for police service involve happy folks with no complaints, anger, frustration, depression or other significant emotional display. Officers constantly monitor the subjects of their investigations, witnesses, complainants and others. Such

monitoring facilitates officer safety and is an integral part of police officer training. The details obtained from Woodward in the initial stages of the investigation and his contact with Officers Hill and and Perry show that they were watching Woodward and listening to him.

2. Until well after being handcuffed, Woodward showed no behaviors that would prompt a reasonable, well-trained officer to believe that he needed medical attention. Though he showed signs of drug or alcohol impairment, no behaviors suggested that he was in urgent need of medical attention. As Sergeant Shockley expressed, there was "no need for [Woodward] going to the hospital. He appeared perfectly fine."

3. Almost immediately after Woodward experienced the TASER deployment and the dog bite, Officer Hill contacted the emergency dispatcher on the police radio and asked for emergency medical services to respond. Officer Hill made this request even before seeing any significant signs of distress and even before Woodward started banging his head on the pavement. Officer Ford also requested emergency medical services. The officers' request was consistent with the action of a reasonable well-trained officer and was consistent with generally accepted policies, practices and training. Sergeant Shockley later followed up on Officer Hill's request, checking on the arrival status of the emergency medical providers after Woodward started banging his head on the pavement.

4. Once Woodward was handcuffed and somewhat controlled on the ground, he began to bang his head onto the asphalt pavement. Sergeant Shockley, Officer

Ford and Officer Perry immediately moved Woodward onto the softer grass surface in an effort to prevent Woodward from injuring himself. Officers Ford and Perry sat Woodward up, preventing him from banging his head on the ground. The move to the softer surface and the manipulation to a seated position were actions that reasonable, well-trained officers would take and were consistent with generally accepted policies, practices and training.

5. The Gallatin Police Department provided its officers with training about a condition often called excited delirium (sometimes referred to as agitated delirium or agitated chaotic event). Police officers are taught that a primary and critical step in dealing with a person who is combative and may be experiencing an excited delirium event is to capture and control the person.

6. Sergeant Shockley reported that he observed signs of excited delirium after Woodward was already under arrest and after an extended time that Woodward had been calm and cooperative. Acute excited delirium is often not evident immediately, even to a trained observer. Woodward was already handcuffed at the time that he showed obvious behaviors that might have been signs of excited delirium. In such circumstances, officers are trained to control and restrain the subject and to facilitate cooling of hyperthermic subjects. Cooling often is accomplished by equipment and supplies carried by emergency medical responders and applied with the assistance of the police officers. In some areas, emergency medical providers are authorized to use drug intervention with possible excited delirium subjects. If that is the case, the police officers' role is to assist the

*Woodward v. City of Gallatin, et al.*
*Report of Kenneth R. Wallentine*          24
Case 3:10-cv-01060   Document 76-1   Filed 04/15/13   Page 24 of 39 PageID #: 869

medical personnel as requested and to the degree that the officers are trained and able.

7.    The officers in this case controlled Woodward so that he could be treated by the emergency medical personnel. Emergency medical providers "stage" some distance away from officers dealing with a combative subject. Officers are trained that they first need to control and secure a combative subject before emergency medical personnel will approach to assess and treat. Emergency medical personnel are trained to not approach combative subjects until it is safe for them to do so. The emergency medical personnel cannot effectively assess and treat a person who is thrashing about and resisting efforts to restrain and control him. Securing Woodward so that he could be treated by emergency medical personnel was consistent with the action that reasonable, well-trained officers would take and was consistent with generally accepted policies, practices and training.

f.    **The Gallatin Police Department policies addressing use of force and electronic control devices are consistent with generally accepted police policies and practices.**

1.    The Gallatin Police Department use of force policy, GPD General Order 400.02, requires officers to consider a variety of factors in making use of force decisions. This policy incorporates court decisions construing the constitutional use of force by police officers. The Gallatin Police Department use of force policy is similar in language and consistent in scope with policies that are used to train and guide police officers throughout the nation.

2.  The Gallatin Police Department use of force policy includes discussion of deployment of the TASER electronic control device. This portion of the policy is similar in language and consistent in scope with policies that are used to train and guide police officers throughout the nation.

3.  The Gallatin Police Department trained its officers in the use of force policy in the same year as the event with Woodward. Training police officers on an agency's use of force policy is consistent with generally accepted policies, practices and training.

g.  **The Gallatin Police Department supervision and review of police use of force is consistent with generally accepted police policies and practices.**

1.  Each use of force by a Gallatin Police Department officer is reported on a data collection form and is first reviewed by supervisor and subsequently reviewed by a Use of Force Review Committee with command level participation. The committee's review and finding is then submitted to the Chief of Police. This form of review is consistent with generally accepted policies, practices and training. The breadth and extent of the review through the various supervision and command levels, coupled with the ultimate review by the Chief, is consistent with best practices in use in many police agencies throughout the nation.

2.  The system of review of each use of force by a Gallatin Police Department officer meets the nationally-recognized accreditation standards of the Commission on Accreditation for Law Enforcement Agencies and meets other accreditation

standards in use by other law enforcement accrediting bodies throughout the nation.

3.    The system of review for police use of force is enhanced by a separate early warning system designed to identify potential concerns through a pattern of citizen complaints. As part of the internal affairs investigation process, the Gallatin Police Department uses a software program that tracks and analyzes complaints against officers. Use of such an early warning system is consistent with best practices in use in many police agencies throughout the nation.

4.    Plaintiff's expert asserts that the Gallatin Police Department lacks a policy or procedure to monitor the use of force by its officers. This claim is false and is refuted by the documents reviewed by me in the instant case and in published public reports. The Gallatin Police Department demonstrates by directive and practice the use of force by officers is constantly monitored and evaluated. Use of force monitoring is verified as part of the Commission on Accreditation for Law Enforcement Agencies ("CALEA") accreditation process that was successfully completed by the Gallatin Police Department in 2009. CALEA Standard 1.3.6 requires the completion of a written report whenever an officer uses a force tool or applies weaponless physical force. CALEA Standard 1.3.7 requires administrative review of all use of force reports.

5.    As I examined the use of force reports, the Use of Force Review Committee findings and the multiple years of annual Use of Force reports from the Gallatin Police Department, I discerned no pattern of unjustified use of force by Gallatin

Police Department officers. To the contrary, I noted that the Gallatin Police Department use of force frequency is lower than the National Institute of Justice police use of force and police/citizen contacts reports. Moreover, I noted a commendably high degree of transparency and self-disclosure by the Gallatin Police Department in the area of police use of force. Not only is the pattern alleged by plaintiff unsupported by the pertinent records, but a pattern is readily evident showing that the Gallatin Police Department officers limit force, use less injurious and non-lethal force tools where appropriate and that the police command staff reviews each use of force and discloses its findings to the community.

6.     The United States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, in cooperation with the National Institute of Justice, tracks and analyzes the rate of police use of force and police/citizen contacts. Nationally, among persons who had contact with police, an average of 1.5% had force used or threatened against them during their most recent contact. The Gallatin Police Department use of force data that I reviewed from historical records shows a use of force rate for police/citizen contact that is markedly lower than the national average. The typical rate for the Gallatin Police Department is approximately half of the national rate. This is highly suggestive of effective training, supervision and review of use of force by the Gallatin Police Department.

7.     The Gallatin Police Department proactively identifies and analyzes use of force rate trends within the Department and publishes its analytical findings. This self-

analysis and self-reporting is consistent with best practices in use in many police agencies throughout the nation. For example, when the Department noted that just three officers accounted for over half of the uses of force by an officer in a single year, the Department conducted an internal investigation to determine whether there was any pattern or increased propensity by these officers to use force. The internal investigation showed that all incidents of force involving these officers were within Gallatin Police Department policy guidelines. Such a self-generated investigation and analysis further illustrates the lack of any pattern of unjustified uses of force by the Gallatin Police Department officers.

2.     In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career. A summary of my qualifications, publications, litigation history and fee schedule are recited herein.

3.     **My qualifications as an expert in this subject matter include the following:** I am a law enforcement officer in the State of Utah. My primary employment is for the Utah Attorney General, where I serve as the Chief of Law Enforcement. I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah. I also supervised the police service dog training and certification program for the State of Utah. I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety. I was certified as a law enforcement officer in the State of Utah in

1982. My duties include direct supervision and command of various investigative units and agents throughout the State of Utah, supervising approximately thirty-five law enforcement officers, forensic specialists, and technicians, as well as approximately one dozen part-time peace officer employees. I command the State of Utah Child Abduction Response Team. I command the State of Utah Officer-Involved Fatality Investigation Team. I am a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations. In 2010, Governor Herbert selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

4.      I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability. I regularly teach in the Basic Training programs of the Utah State Police Academy. I regularly teach in the following specialized courses: Advanced Officer Course, Firearms Instructor Course, Utah Drug Academy, Utah Crime Scene Investigators Academy, Utah Sheriffs' Association Command College, First Line Supervisor Course, POST K9 Unit Administrator Course, POST Patrol Dog Handler Course, POST Narcotics Detector Dog Course, and others. I am a former police service dog handler and worked with the Uintah County Sheriff's K9 Unit from 1995 to 2001. I continue to provide instruction and evaluation services for the POST Police Service Dog program. I am a certified POST Firearms Instructor, often serving as the lead instructor for POST Firearms

*Woodward v. City of Gallatin, et al.*
*Report of Kenneth R. Wallentine*               30

courses. I am certified by the Force Science Research Center as a Force Science Analyst ®. I am a certified TASER® Instructor. I am a certified Excited Delirium and Sudden Death Investigation Instructor. I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation. In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems.

5.      I am a licensed attorney, having practiced law since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court. I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities. I was formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety and am responsible for course design and curriculum selection for Criminal Procedure.

6.      In addition to my primary employment, I occasionally consult and provide expert witness opinions on police procedures, and use of force issues. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies. I am the co-founder of, and legal advisor to, a best practices advisory group that developed comprehensive model policies and

*Woodward v. City of Gallatin, et al.*
*Report of Kenneth R. Wallentine*      31
Case 3:10-cv-01060   Document 76-1   Filed 04/15/13   Page 31 of 39 PageID #: 876

best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies. These policies serve as a model for all Utah public safety agencies.

7.     I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies. I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States. In 2011, I served as the United States District Court-approved principal instructional designer and instructor for mass retraining of the Atlanta Police Department pursuant to a consent decree in a civil rights lawsuit. I trained approximately 1,800 City of Atlanta police officers in lawful use of force, detention and civil rights.

8.     I participate and serve in a number of community and professional capacities. Professional activities pertinent to law enforcement include serving as a Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, member of the K9 Section of the Utah Peace

Officers Association, member of the United States Police Canine Association, past member of the

board of directors of the NAACP, Salt Lake City branch, and board member and immediate past-

Chairman of the Utah Law Enforcement Legislative Committee. I formerly served as a

gubernatorial appointee to the Council on Peace Officer Standards and Training. I currently

frequently serve as a member *pro tempore* of the Council on Peace Officer Standards and

Training. I am a former member of the Scientific Working Group on Dog and Orthogonal

Detector Guidelines, a national scientific best practices organization sponsored by the Federal

Bureau of Investigation, the Department of Homeland Security, and the Transportation Security

Administration, with support coordinated by the International Forensic Research Institute at

Florida International University. I have been a presenter at a variety of professional conferences

and seminars, including presenting on use of force training at the annual convention of the

International Association of Chiefs of Police.

9.      Since 1994, I have been a consultant with the K9 Academy for Law Enforcement and the

International Police Canine Conference. My principal responsibilities are to provide use of force

training, civil liability instruction, and search and seizure instruction. I have provided police

service dog training and certification standards consultation for two police service dog

organizations, including a western regional group and one of the major national groups. I serve

as a consultant for the California Narcotic and Explosive Canine Association and have been a

featured lecturer at their annual training conference over the past decade.

10.     I am a Senior Legal Editor for Lexipol, Inc., the nation's largest provider of policy

formulation and revision for public safety agencies and policy-based training, responsible for

reviewing and editing the work of legal staff in creation of policy manuals for law enforcement

agencies. In that capacity, I have assisted in the drafting and review of use of force, police service dog and electronic control device policies in current use by more than 1,100 police agencies and correctional facilities in the United States. I have also assisted in the drafting and review of use of force policies for major metropolitan police agencies under supervision of federal court orders.

11.    **My publications (limited to ten years) include the following:** I have previously published a number of other professional articles, many of which have been subjected to peer review. My most recent book, *The K9 Officer's Legal Handbook*, was published by Lexis/Nexis Matthew Bender in December 2008. It includes an extensive discussion of use of force by police officers. Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, was published in 2007 by the American Bar Association Publishing Division. It is a treatise on public safety and criminal procedure, and includes multiple chapters on search and seizure and use of force by police officers. My other published works, limited to the past ten years, include: *Post Incident Video Review*, Police Chief, V. 68, No. 12 (2011); *Cell Site Location Evidence: A New Frontier in Cyber-Investigation*, 2011 (2) AELE Mo. L. J. 501, *Prospects, Pitfalls and Pains of Social Media and Public Safety*, The Municipal Lawyer, September 2010; *Police Department May Read Text Messages Sent on Agency-issued Pagers: City of Ontario, California v. Quon*, Police Chief, V. 57, No. 8 (2010); *Collection of DNA Upon Arrest: Expanding Investigative Frontiers*, Police Chief, V. 57, No. 1 (2010); *Targeting TASER: The New TASER Aim Points,* Law Officer, January 2010; *The Risky Continuum: Abandoning the Use of Force Continuum to Enhance Risk Management*, The Municipal Lawyer, July 2009; *Explosive Detector Dog Legal Issues*, K9 Cop, February 2009; *Does Police Service Dog Deployment Equal Deadly Force?*, K9 Cop, April 2009; *Human Scent Line-up Evidence*, Police

K9 Magazine, August 2009; *Acknowledging Gender in Fitness Standards for Police: An Invitation to Liability?*, The Municipal Lawyer, January 2008; *K9 Court Testimony*, Police K9, December 2006; *United States Supreme Court Review for Corrections Managers*, Corrections Managers Report, October 2006; *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005); *Conduct Unbecoming an Officer*, The Municipal Lawyer, January, 2005; *Limits on Off-Duty Police Employment*, The Municipal Lawyer, Spring 2004; *Conjugal Prison Visits*, Corrections Manager, March, 2003; *Life in the Law* (BYU Press 2002), co-author; *Investigating In-Custody Death*, Corrections Manager Report, October 2002; *Police Canine Risk Management*, The Municipal Lawyer, July 2002; and a variety of columns addressing law enforcement issues and published by PoliceOne.com. I am the author of a reference book currently in use in the Utah Law Enforcement Academy, as well as other police academies throughout the United States, titled *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005). This book discusses detention and arrest of persons, use of force, and search and seizure of persons and property, among other subjects.

12.     **My fee schedule is established as follows:** I charge $250.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony. I bill for actual travel expenses and a travel fee of $1,000.00 per day/part-day for travel to western states and $1,500.00 per day/part-day outside western states.

13.     **My prior experience as an expert witness (limited to the past four years) includes the following cases:** I have been qualified as an expert in the subject matter of police procedures, including use of TASER® devices, excessive force, shootings and wrongful death claims, search and seizure, police service dog use, both in drug detection and dog bites, and I have never had a

court decline to find that I am a qualified expert witness. I have testified and/or provided depositions and trial testimony in the following cases which may be generally related to the subject of the instant litigation in the past four years: *Minor v. Johnson, et al.*, No. 1016-CV08762, Circuit Court of Jackson County, Missouri, 2012. Deposition testimony given on behalf of defendants. Subject matter: wrongful imprisonment. *Garcia v. Sacramento City, et al.*, No. 2:10-CV-00826-JAM-KJN, United States District Court of California, Eastern Division, 2012. Deposition testimony given on behalf of the defendants. Subject matter: police canines. *Cavanaugh v. Woods Cross City, et al.*, No. 1:08CV00032, United States District Court of Utah, Central Division, 2011. Trial testimony given on behalf of the defendants. Subject matter: excessive force and TASER use. *Ibarra v. City of Watsonville*, Watsonville Municipal Civil Service Commission, 2011. Trial testimony given on behalf of Respondent. Subject matter: police canines and excessive use of force. *Jones v. City of Waterloo*, No. 6:10-CV-02014-LRR United States District Court of Iowa, 2011. Trial testimony given on behalf of defendant. Subject matter: police canines. *Cardall v. Thompson, et al.* Case No. 2:10-CV-00305-CW, United States District Court of Utah, Central Division, 2011. Deposition testimony given on behalf of the defendants. Subject matter: excessive force, wrongful death. *Krause & Martin v. Manalapan Township*, Case No. 3:09-CV-0287, United States District Court of New Jersey, 2010. Deposition testimony given on behalf of defendant. Subject matter: police canines. *Mitchell v. Dow*, Case No. 2:08-CV-00726-DB, United States District Court of Utah, 2010. Trial testimony given on behalf of defendants. Subject matter: excessive force. *Al-Asadi v. City of Phoenix, et al.*, No. 2:09-CV-00047, United States District Court of Arizona, 2010. Deposition testimony given on behalf of the defendants. Subject matter: excessive force and propriety of an arrest.

*United States v. Beltran-Palafox*, No.09-40022-01/02 JAR, United States District Court of Kansas, 2010. Trial testimony given on behalf of the plaintiff. Subject matter: search and seizure. *United States v. Trestyn & Herren*, No. 09-CR-00216-B, United States District Court of Wyoming, 2010. Trial testimony given on behalf of the plaintiff. Subject matter: search and seizure. *United States v. Ludwig*, No. 08-CR-00224-D, United States District Court of Wyoming, 2009. Trial testimony given on behalf of the plaintiff. Subject matter: search and seizure. *Evans v. Taylorsville City*, Case No. 2:06-CV-00631 TS, United States District Court of Utah, Central Division, 2009. Deposition testimony given on behalf of the defendants. Subject matter: improper execution of search warrant, negligent investigation. *Swofford v. Eslinger*, Case No. 6:08-CV-00066-PCF-DAB, United States District Court of Florida, Orlando Division, 2009. Deposition testimony given on behalf of the defendants. Subject matter: improper search and excessive force. *Becker v. Bateman*, Case No. 2:07-CV-311 PGC, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: excessive force. *Salva v. Kansas City Board of Police Commissioners*, Case No. 07-CV00194-JTM, United States District Court of Missouri, Western Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: wrongful death. *Turnbow v. Ogden City et al.*, Case No. 1:07-CV-114, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: wrongful death. *Nielson v. South Salt Lake City & Burnham*, Case No. 2:06-CV-335, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: sexual misconduct. *Trammell v. Jacksonville Beach City Police Department*, Case No.

3:06-CV-984-J-16MMH, United States District Court of Florida, Jacksonville Division, 2008. Deposition testimony given on behalf of the plaintiffs. Subject matter: excessive force.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by plaintiff's experts, and further investigation. I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or video and photographs.

I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me. There are some inconsistencies in the accounts provided by various witnesses and the individual officers. I have considered the sight lines and visual perspectives available to the various witnesses and the relative consistencies of various witnesses. Such inconsistencies are common to any circumstance where various persons hear, see or otherwise perceive an event from diverse locations and with diverse attentional focuses.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

## CONCLUSION

The Gallatin Police Department officers' detention of Woodward was consistent with actions of reasonable well-trained officers and was consistent with generally accepted police policies, practices and training. The officers used appropriate control techniques, including proper deployment of the TASER electronic control device, to detain Woodward. Police service dog Alex's bite was unintended and was not commanded by Officer Hill. The Gallatin Police Department policies addressing use of force and electronic control devices are consistent with generally accepted police policies and practices. The Department's supervision and review of police use of force is consistent with generally accepted police policies and practices.

Kenneth R. Wallentine
July 24, 2012

Kenneth R. Wallentine
█████████████████████
Murray, Utah 84123