IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF

TENNESSEE AT NASHVILLE

ANDREA WOODWARD, individually
and as next friend and wife of
JEFFERY WOODWARD, deceased,
and SANDRA RUTTER,

                        No. 3:10-cv-01060

        Plaintiffs,

                        Judge William J. Haynes, Jr.

    vs.

                        Magistrate Judge John Bryant

CITY OF GALLATIN, TENNESSEE,
et al.,

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF KENNETH R. WALLENTINE

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

TAKEN AT:                        The Hyatt Place Hotel
                                     52 North Tommy Thompson Drive
                                     Salt Lake City, Utah

DATE:                            Friday, September 14, 2012

TIME:                            9:17 a.m.

REPORTED BY:              Scott M. Knight, RPR

1                              APPEARANCES

2

3        FOR PLAINTIFFS:

4        JOE BEDNARZ, JR., ESQ.,

5        BEDNARZ & BEDNARZ

6                404 James Robertson Parkway

7                Suite 2100

8                Nashville, Tennessee 37219

9

10       FOR DEFENDANTS:

11       BRANDT M. McMILLAN, ESQ.,

12       FARRAR & BATES, LLP

13                211 Seventh Avenue North

14                Suite 500

15                Nashville, Tennessee 37219

16

17

18

19

20

21

22

23

24

25

INDEX

WITNESS                                              Page

    KENNETH R. WALLENTINE

EXAMINATION                                            4

BY-MR.BEDNARZ

EXAMINATION                                          105

BY-MR.McMILLAN

FURTHER EXAMINATION                                  107

BY-MR.BEDNARZ


EXHIBITS

No. Description                                      Page

1   Report of Kenneth R. Wallentine                 108

1    Deposition of Kenneth R. Wallentine

2    September 14, 2012

3    PROCEEDINGS

4    KENNETH R. WALLENTINE, called as a witness for

5    and on behalf of the Plaintiffs, being first duly sworn, was

6    deposed and testified as follows:

7    EXAMINATION

8    BY-MR.BEDNARZ:

9    Q.    Mr. Wallentine, my name is Joe Bednarz, Jr.  We

10   met just a few minutes ago.  And I've got your report and CV

11   here, so I kind of know about your background and your

12   training, but I want to go through some of that to start with.

13   Why don't we start with the education, just kind of take me

14   through it.

15   A.    Do you want me to work backwards or forward?

16   Q.    Oh, why don't we go backwards.

17   A.    That's probably easier because then you can cut

18   me off to when I start telling you about--

19   Q.    When you get to elementary school--

20   A.    --got kicked out of elementary school in third

21   grade, you may not care about that.

22   Q.    Well, I need to hear about that now that you told

23   me.

24   A.    My most--my most recent formal education that

25   ended with a terminal degree was law school, graduated from

1   law school in April, I believe it was, of 1990 here in Utah,

2   Brigham Young University.  I attended law school from 1987 to

3   1990.  Prior to that, I graduated with a bachelor's degree and

4   I--I don't recall the year on the degree.  I was a long-term

5   undergraduate student.  I did a couple of years in the late

6   '70s, and when I became a police officer, I started on the one

7   or two classes a semester program.  Obviously, this was before

8   we had the opportunity for distance learning and Web-based

9   education, and so I would attend as my rotating schedule

10  allowed.  My terminal degree, bachelor's degree, also was from

11  Brigham Young University.  And I want to say, sir, that it was

12  1985 or 1986 that I completed that.  Prior to that, I attended

13  high school, graduated high school here in Utah, 1974.

14        Q.     Okay.  That's probably far enough back.

15        A.     And it was not anything particularly malicious

16  that got me kicked out of third grade, sir.

17        Q.     Okay.  I got kicked out in fifth grade, but

18  that's a long story.

19             In addition to the formal education we've talked

20  about, I take it you've been to a number of--I don't guess

21  vocational schools is the right word, but on-the-job, or

22  training related to specific jobs?

23        A.     Yes, sir.

24        Q.     For instance, police academy?

25        A.     I attended the police academy.  At the time I

1   began law enforcement in Utah, the law did not require that

2   you attend the police academy to be a police officer.

3   Obviously, the law has changed.  Nonetheless, I did attend the

4   police academy.  After I'd been a cop for a year and a half,

5   two years, attended the police academy in nineteen eighty--

6   '83, I believe.  1983 here in Utah.

7        Q.     Okay.  Any other significant education that--I

8   know we all go to week-long seminars and things like that, but

9   anything that you would consider significant?

10       A.     Beyond a week-long seminar, dog handler training.

11  And most recently there is a program known as the West Point

12  leadership program, named for the West Point Military Academy,

13  the United States Army's leadership training program.  That is

14  equivalent of a one-semester program I completed in 2010, the

15  fall--fall semester of 2010.

16       Q.     Why don't we go through your employment a little

17  bit.  And I guess you--currently you're with the state of

18  Utah?

19       A.     Yes, sir.

20       Q.     And tell me about that position.

21       A.     I'm the chief of law enforcement for the Utah

22  attorney general.  I command the investigation division, which

23  is comprised of a couple of investigative bureaus, each of

24  which has different working groups or different-- they're

25  called sections or squads within it.  I'm responsible for the

1   day-to-day command and supervision of all of the investigative

2   efforts within the office, with the exception of some Medicaid

3   fraud, white-collar stuff that's done out of another unit.

4        Q.     What type of investigations would your unit

5   handle?

6        A.     We--we have plenary jurisdiction over certain

7   types of crimes that are--are designated by statute or

8   administrative rule or by agreement.  Those include, for

9   example, child sexual exploitation.  Child sexual predation is

10  an area of plenary responsibility.  We have a group that

11  focuses on major violent, substantial financial crimes

12  committed by undocumented residents, including drug

13  trafficking, gun trafficking, and human trafficking.

14            We deal with the--what we colloquially call cold

15  case homicide cases, clearinghouse for cold case homicide

16  cases in the state.  We have a homicide investigation support

17  role.  The state of Utah--no surprise, I'm sure--has a number

18  of small jurisdictions, a number of rural jurisdictions which

19  may or may not be equipped to handle complex homicides, and so

20  we have investigators assigned to travel the state to do that.

21            We handle investigations into officer-involved

22  fatalities, whether they be shootings or other types of

23  officer-involved fatalities in a couple of contexts.  We may

24  be called on to investigate potential--conduct that

25  potentially could be criminal on--on the part of police

1    officers, or more commonly, are requested to assist a county

2    attorney or a law enforcement agency in the investigation of

3    an officer-involved fatality or a substantial--excuse me--a

4    significant use of force by a police officer.

5          I stress:  not for administrative purposes.

6    There's a separate state agency that deals with the

7    administrative and licensure of police officers.  We don't

8    have anything to do with that.

9          We also have responsibility for public correction

10   investigations within the state for white collar and financial

11   crimes that impact broadly the interests of the state of Utah,

12   the interests of Utah state government that cross county

13   and/or state lines and/or require coordination with federal

14   investigative agencies.  We have a unit that deals primarily

15   with computer forensics.  I'd be happy to provide more detail,

16   if you'd like, with that, but that's probably a good summation

17   just to say they deal with computer forensics.

18         And then we have a broad responsibility with

19   respect to the civil rights investigations and providing

20   investigative support for the various components of attorney

21   units within the office of the attorney general.

22         Those are the--that's a gross summary of the

23   primary areas of investigative responsibility.  And then

24   there's sort of a catch all.  And that is, we conduct

25   investigations as requested or directed by leadership of the

1   Utah State Legislature, by the governor, the attorney general,

2   or members of the governor's cabinet.

3          Q.     Let me ask you this:  You've got a couple of

4   cases listed for your litigation history from Utah.  One is

5   the Cardall--Cardall case--

6          A.     Cardall, yes, sir.

7          Q.     --vs. Thompson.  Did you have any involvement in

8   investigating that case for your office?

9          A.     I didn't have any involvement investigating that

10  case for--in my role as employee of the State of Utah.

11         Q.     Did your office have any role in investigating

12  that case?

13         A.     No, sir.

14         Q.     And you testified on behalf of the police officer

15  defendants or--

16         A.     The agency defendants.

17         Q.     I think I saw another one here in Utah.

18  Mitchell. Is that a use of force case?  Yeah.

19         A.     Oh, Mitchell vs. Dow?

20         Q.     Yes.

21         A.     Yes, sir.

22         Q.     Did your office have any role in investigating

23  anything to do with that case?

24         A.     No, sir.

25         Q.     And I guess help me out:  When does your office

1   get involved in a civil rights complaint and when don't they?

2        A.    If there's a direct request from the aggrieved

3   party in a civil rights issue, under our state statute, an

4   aggrieved party has the ability to request the attorney

5   general to investigate a civil rights allegation.  There are

6   other circumstances in which, for example, the agency known as

7   police officer--excuse me--Peace Officer Standards and

8   Training, which is--it's an agency responsible for licensure

9   and certification of law enforcement officers.

10        If, in the course of their investigation, they

11   believe that there has been substantial misconduct that might

12   involve violation of civil rights or criminal allegations,

13   they can refer a case for non-administrative investigation to

14   our agency.  A county attorney or district attorney or a

15   police agency executive may make a similar request, or the

16   office does have the ability to self-initiate a civil rights

17   investigation.

18        Q.    You also list Lexipol.  Tell me about that.

19        A.    Lexipol is a risk management service that

20   provides policy drafting and consulting services on a broad

21   scale for--I believe the current number's around 1,400 law

22   enforcement agencies throughout the United States--police

23   departments, sheriff's offices, district attorney offices,

24   state attorney general offices--as well as the same services

25   with respect to custody institutions, jails throughout the

1   United States and, to a somewhat lesser degree, to fire

2   services--fire departments.

3        Q.     What type of services do they provide to law

4   enforcement agencies?

5        A.     The primary service is to prepare policy manuals

6   and provide policy consulting to law enforcement agencies.

7   There are some other role in the context, for example, an

8   agency may be subject to some sort of monitoring by the United

9   States Department of Justice and Lexipol may assist that

10  agency in conforming its policies to consent decrees or

11  requests or instructions, persuasive comments by the

12  Department of Justice.

13       Q.     And what--what do you do for Lexipol?

14       A.     I work primarily in drafting and editing policy

15  in a number of areas.

16       Q.     Like what?

17       A.     My primary focus would be in use of force in

18  electronic control devices.  Also, I referred to as conducted

19  energy devices or conducted energy weapons, police service dog

20  use, restraint use.  Also would be--typically if there were a

21  search and seizure-related policy that would typically be one

22  that would come my way for editing and review or perhaps even

23  initial drafting.

24       Q.     And when you say policy, is that the same as

25  we're going to be talking about later with the general orders?

1    A.    Some agencies make a distinction between general

2    agencies and policies, but most of the time, sir, those terms

3    are interchangeable for most departments.

4    Q.    So if Gallatin Police Department called Lexipol

5    and said, We want you to help us draft a use of force policy,

6    then that's something you would be involved in drafting and

7    editing?

8    A.    Yes, sir, assuming that we agreed to go into that

9    state, yes.

10    Q.    Okay.  What else--and how long have you been in

11    your current position with the attorney general?

12    A.    Since early 2005.

13    Q.    And in addition to those two things, are there

14    any other things that you're doing today employment-wise?  I

15    know you do some consulting, because we're here today.

16    A.    Sure.  I do some consulting.  I occasionally

17    teach.  I'm not teaching this semester, and I have not taught

18    for a couple of semesters.

19    Q.    And what kind of teaching have you done?

20    A.    Taught at the BYU law school, criminal procedure.

21    I--I--it actually has been more recent than the last couple of

22    semesters.  I do teach at the police academy, although that's

23    not--not a typical college course.  People can get college

24    credit for it.

25    Q.    What do you teach at the police academy?

1    A.    Use of force, search and seizure, teaching a

2    couple of the specialized courses with respect to the drug

3    academy on drafting and executing search warrants, teaching

4    the canine administrator's course, the canine handler's

5    course.  And occasionally, I will go present a seminar for,

6    you know, a professional organization, whether it be a

7    continuing legal education program for the Bar--I have a role

8    in the Utah State Bar--or whether it be for a law enforcement

9    organization.

10    Q.    Do you teach Taser use at the academy at all?

11    Certify or any of that stuff?

12    A.    When you say at the academy, the answer is yes.

13    If you were to ask for the academy, the answer is no.

14    Q.    Okay.  Explain that one for me.

15    A.    Sure.  The Utah state police academy is located

16    on a college campus and it--it hosts--it's the training venue

17    because of its physical location and because of the physical

18    facilities that it is able to offer a number of training

19    opportunities that are not necessarily sponsored by the Utah

20    police academy.  In Utah, we do not have as a component of our

21    basic training course for law enforcement officers a Taser

22    course, but Taser courses are offered at the police academy.

23    Q.    If a city--let's say Salt Lake City--I'm sure

24    they carry Tasers.  Do all the officers carry Tasers?  Do you

25    know?

1    A.    The Salt Lake City Police Department?  The

2    majority, if not all, of the patrol officers in Salt Lake City

3    do carry Tasers.

4    Q.    Would they conduct their own training or would

5    that be something they would send the officers to the academy

6    for this--for your training?

7    A.    Salt Lake City being the second or third largest

8    police agency in the state and having its own training

9    facility, would typically do its own training in-house.  And

10   I--I just happen to know that they have a number of certified

11   instructors within their agency.

12   Q.    Your CV says you're a certified excited delirium

13   and sudden death investigation instructor?

14   A.    Yes, sir.

15   Q.    Who certifies something like that?

16   A.    The Institute for Prevention of In-Custody

17   Deaths.

18   Q.    Mr. Peters?

19   A.    Yes, sir, John Peters.  Do you know John?

20   Q.    I--he was involved in another case I had.

21   So do--how did--how does he certify you to teach

22   these things?

23   A.    They have an instructor course that is referred

24   to as a train the trainer course.  You attend that course,

25   take an examination, and receive certification to teach the

1   curriculum that they present.

2       Q.      And I guess they provide the materials for what

3   you teach?

4       A.      They do.

5       Q.      So I would imagine your opinions in that regard

6   are similar to his--

7               MR. McMILLAN:  Object.

8   BY MR. BEDNARZ:

9       Q.      --on the training that's required on excited

10  delirium and sudden death investigations?

11              MR. McMILLAN:  Are you asking him to comment on

12  what you imagine?

13  BY MR. BEDNARZ:

14      Q.      You can answer if you understand what I'm asking.

15      A.      I'm not sure that I understand, but I'll do my

16  best.  I--I certainly--I use the--when I teach a course, I use

17  the material that I glean from the IPICD course.  And I have

18  read a number of Dr. Peters' publications and regularly attend

19  and occasionally present at the annual conference of the

20  Institute for Prevention of In-Custody Death.  And I think

21  that Dr. Peters and I have some--I think we follow the same

22  general area of instruction, but I've never heard him teach

23  another group, so I couldn't say.

24      Q.      Is that still held in Vegas every year?

25      A.      Yes.  It will be in Las Vegas again this year.

1    Q.    Somehow I--I--obviously it was a mistake, but I

2    ended up there one year.  I attended that seminar, but--

3    A.    Well, it's open to--I think at least in Utah, you

4    can get continuing legal education credits for doing it.

5    Q.    Yeah, I did.

6          It says you occasionally consult to provide

7    expert opinions on police procedures in use of force issues.

8    How often do you do that?

9    A.    I typically will--from start to finish, typically

10   will handle four, five cases a year.  It's obviously an

11   adjunct to my primary employment, so it depends.  If the

12   attorney I work with regularly has two or three cases, I might

13   do more in a year.  I think some years, I've done less.

14   Q.    Do you ever testify on behalf of a plaintiff or

15   is it always the defendant?

16   A.    I've testified on behalf of plaintiffs.

17   Q.    Okay.  Is there a percentage that you would put

18   on that?

19   A.    I think it would be fair to say that the majority

20   of the work that I do is for defendants.  The majority of the

21   calls I get, frankly, are for defendants.  And about half the

22   time when I'm asked to testify on behalf of either a plaintiff

23   in a civil case or a defendant in a criminal case, I've

24   testified for them.

25   Q.    And then some of your professional activities and

1  organizations--I'm just going to go through briefly--but

2  International Association of Law Enforcement Educators and

3  Trainers Association.  What is that?

4      A.    It is just what it sounds like.  It's an

5  organization of people who teach law enforcement subjects that

6  puts out training updates, may have seminars on not

7  necessarily--both the substantive topics that are being

8  taught, but also better ways to involve the students in the

9  classroom, better ways to present training.

10      Q.    And is that actually an international

11  association? Is it a national association or how would you

12  characterize that?

13      A.    There are a number of members from Canada.  And

14  I--I know one or two people from Europe.  It's truly an

15  international organization.

16      Q.    International Association of Chiefs of Police.

17      A.    Boy, that truly is an international organization,

18  as evidenced by--if you go to the conference on uniform day

19  and you see these police chiefs from Africa who appear in the

20  most interesting regalia of their--of their organizations.

21  But that is a--the majority of the members there are, of

22  course, from the United States, but it's truly an

23  international organization.

24      Q.    I take it you don't have to have a chief of

25  police to be a member?

1    A.    You do not.  There are different levels of

2    membership.  There are--I think that there are lieutenants,

3    even, that are members.

4    Q.    Okay.  And can you tell me what that organization

5    is or what it does, the purpose of the organization?

6    A.    Sure.  It is, I believe--and I'm not certain

7    about this, Mr. Bednarz, but I believe it is the largest law

8    enforcement administrators organization in the world.  I've

9    visited their headquarters in Washington, D.C.  And it's a

10   huge organization.  And there are--there are a number of

11   focuses that--primary focus is to better the delivery of

12   public safety services throughout the world, but again, I

13   stress that the majority of the members, I believe, are in the

14   United States, certainly all the conferences are in the United

15   States.

16         There's a large education and training component

17   there.  There's a component that promotes officer safety that

18   has, you know, for example, right now, a significant campaign

19   to encourage police officers to do something as simple as

20   wearing seat belts, which, you know, you would think cops

21   would do, right, but many don't.  And to wear vests.  There

22   are a number of sections within that group; for example, legal

23   officers section, the Indian country section, the

24   psychological services section that deal with specific

25   subtopics and issues within law enforcement.

1    Q.    And--

2    A.    Is that--is that good enough?

3    Q.    I think so.  And I think we're going to come

4    across some model policies that they've--

5    A.    They do--

6    Q.    --put out.

7    A.    --they do also have a model policy service, as

8    well as a training newsletter service.

9    Q.    And I kind of moved forward, but let's go back to

10   your employment.  And prior to going to work for the State of

11   Utah, what did you do?

12   A.    Well, through 2001, I served as the chief deputy

13   county attorney in Uintah, U-i-n-t-a-h, County, Utah.  I had

14   that role from, I believe, 1996.  During that same time

15   period, I taught--I taught at the police academy for a long

16   time.  Nearly--nearly twenty years.  So that employment spans

17   that whole stretch.  And also worked as a police officer

18   during that period of time as well.

19   Q.    Okay.  And how long were you a police officer?

20   A.    Well, I--

21   Q.    Or how long did you--

22   A.    Still am.  So first--

23   Q.    How long did you work as a patrol officer, I

24   guess?

25   A.    As a patrol officer?  Full-time, on-the-road

1   patrol officer from 1982 to 1987 with some periods of

2   investigative assignments that, you know, took me off the

3   road, but I still had the rank of officer.  And then from 1986

4   to two thousand--2000 or 2001, there was a period of time

5   where I worked for both Uintah County and for the State of

6   Utah, although not in my current position with the State of

7   Utah.

8          Q.      From '86 to 2000, 2001, you were doing what?

9          A.      From '86 or '96?

10         Q.      After you were patrol officer, what did you do?

11         A.      Okay.  After I was patrol officer, I worked

12  part-time as a patrol officer for my first semester in law

13  school.  I recognized that the American Bar Association knew

14  better than I did, you couldn't work and go--at least I wasn't

15  smart enough to work and go to law school.  So I went to law

16  school till 1990.  I--you know, I did this sort of typical

17  thing.  In the summers, I worked in a couple of different law

18  firms.  I graduated in 1990, took the Bar, worked for a law

19  firm in the summer.

20                 Fall of nineteen--the late summer or fall of

21  1990, I went to clerk for the Utah Court of Appeals and did a

22  one-year judicial clerkship there, and then went to the fifth

23  circuit, where I clerked for Edith Jones, the chief judge of

24  the Fifth Circuit Court of Appeals in Houston, Texas.  I came

25  back to Utah and practiced law for a couple of years.  Did

1    enough law enforcement to keep my--my licensure, my

2    certification active, and then in '94 is when I went to Uintah

3    County.

4        Q.    And while you were practicing law, what kind of

5    practice did you have?

6        A.    Primarily employment law, public employment law,

7    law enforcement, you know, police and fire employment, some

8    civil rights work.  I did a little bit of oil and gas

9    litigation, enough to know that it wasn't something I really

10   enjoyed, although at least in Utah, that's where the money is

11   right about now.

12       Q.    Now, most of your publications are pretty

13   straightforward.  I can see the title and the publication. At

14   the bottom, you say, ". . . a variety of columns addressing

15   law enforcement issues and published by policeone.com."  What

16   is policeone.com?

17       A.    policeone.com is a--it's a--both a website and

18   webinar provider and a newsletter provider, both in electronic

19   print, text, and also in video channel.

20       Q.    And who--is there an organization behind

21   policeone or is it a private individual or do you know?

22       A.    There's a--it's owned and operated by a large

23   publishing house, and I do not--in San Francisco.  I can't

24   remember what--I can't remember what the name of the parent

25   corporation is.

1    Q.      What kind of--when you say columns, do they

2    just--is that a monthly or weekly column that they put out

3    or--

4    A.      They do a--they do a couple of different

5    newsletters.  It would be fair to say they've got a newsletter

6    out every two weeks.  I do not write every two weeks.  I write

7    by invitation that--in terms of regular, you know, if you were

8    to target a schedule typically in October, I'll do a column

9    that predicts--strike that--predict's not the best word--that

10   looks forward toward the term of the United States Supreme

11   Court and criminal procedures issues--criminal procedure

12   issues that will be dealt with by the United States Supreme

13   Court.  And then throughout the course of the year, I will

14   comment in columns on certain cases.  I mean, a couple of

15   cases that are coming up, you know, targeted to do--to do

16   columns.  And then from time to time, I'll be asked to explore

17   a certain issue.  I haven't listed them individually, but

18   they're all--they're all out there on the Internet available

19   to be read.

20   Q.      You've got a list of the cases that you testified

21   in, I guess, the last four years.  I'm trying to go through

22   them.  But do you know of any that are listed that you

23   testified on behalf of a plaintiff?

24   A.      Let me just look at the list.  What page is that?

25   Thirty-six?

1    Q.     Well, actually, this is your CV.  What I'm

2    looking at is separate.

3    A.     Okay.  In Ibarra vs. City of Watsonville, I think

4    that is responsive to your question.  But in fairness, I was

5    retained there by the police department as--they were being

6    challenged by an individual police officer.

7           In Trammell vs. Jacksonville Beach City Police

8    Department in Florida, I was retained by and testified in

9    behalf of the plaintiff who was bitten by a police service dog

10   owned and deployed by Jacksonville Beach City Police

11   Department.

12   Q.     Okay.  Can you find any others on this list?

13   A.     Well--

14   Q.     Or--

15   A.     --I don't think so.  Let me look real quick.

16   Q.     Or do you remember any others?  I'm just . . .

17   A.     I do not remember any others within the four-year

18   period where I've actually given sworn testimony either in a

19   deposition or court on behalf of a plaintiff.

20   Q.     Do you remember the facts of Trammell?

21   A.     I remember the general facts of Trammell, sir.

22   Q.     Okay.  I'm just curious what--what the facts were

23   that prompted you to testify for the plaintiff.

24   A.     I'm not sure I understand what you mean by

25   prompted me to testify for the plaintiff.

1       Q.      Well, obviously when you reviewed a case, it was

2   your opinion there was excessive force?

3       A.      That's true.

4       Q.      So I'm just wondering what the facts were that

5   formed the basis--

6       A.      Oh, I see.

7       Q.      --of that opinion.

8       A.      All right.

9       Q.      It was a poorly worded question, but I haven't

10  had much sleep.

11      A.      I get it now.  I thought you were going in a

12  different direction.  Yes, I do remember those facts.

13      Q.      Could you tell us about that?

14      A.      Yes, I can, to the best of my--to the best of my

15  memory.  Mr. Trammell was standing in a backyard at the time

16  that down the street, there had been a burglary committed. The

17  burglar was an African-American man--I don't recall his dress,

18  but the dress was significant--a younger African- American man

19  in pretty darn good physical condition, and in fact, he was

20  very athletic in his escape from the police and the police

21  actually saw him as he was running through the neighborhood.

22  And probably--he probably jumped up or climbed up and started

23  doing a rooftop thing, almost something that you would see in

24  the movies, going from rooftop to roof top.  He was a very

25  athletic man, and very strong.  The police were chasing him.

1   They lost sight of him.  A police service dog team was en

2   route to assist and the police service dog team deployed the

3   dog at one of the last certain sightings of the suspect.  I

4   cannot remember the suspect's name.

5          The dog led the handler and another officer to a

6   wooden fence.  Mr. Trammell was on the other side of the

7   wooden fence in a pretty small backyard there in Jacksonville

8   beach.  Mr. Trammell was talking on the telephone.  There was

9   a baseball game going in the background.  I think he was

10  talking about the score in the baseball game.

11         The dog started to pull through an opening, small

12  opening in the fence.  The handler wasn't able to get through

13  the fence; he was too big.  Ultimately, he broke through the

14  fence.  The handler's testimony was somewhat divergent with

15  Mr. Trammell's testimony with respect to whether the handler

16  actually released the dog or the dog was simply able to reach

17  Mr. Trammell because the length of the leash.  The dog went

18  into the backyard.

19         Mr. Trammell was a man of approximately our age--

20  my age, in his mid 50s.  He was, in fact, approximately my

21  build.  He was shorter than the suspect.  He was nowhere near

22  as athletic and did not have the athletic build of the

23  suspect.  His clothing was very different than the suspect's.

24  Again, I don't recall what the clothing was, Mr. Bednarz.  I

25  just remember that there was a distinction in the clothing.

1   He was a middle-aged white man and not a young

2   athletic African-American man.  And nonetheless, the dog was

3   released in the yard.  The dog was trained in a--in a not

4   common training sport prior to becoming a police service dog.

5   And the dog leaped up and bit Mr. Trammell in a most unusual

6   way causing most unusual damage to Mr. Trammell and

7   significant damage to Mr. Trammell.

8   You talk about in law school the eggshell

9   plaintiff.  Mr. Trammell was a very nice man.  He, however,

10  had been the victim of esophageal--I think it was esophageal

11  cancer.  He had cancer in the throat area.  And the dog leapt

12  up, torqued its body sideways and engaged Mr. Trammell in a

13  throat bite in the front of the larynx and inflicted

14  substantial injury to his--his larynx.  The injuries I

15  actually remember with great clarity.  And--and that's--that's

16  what led to the lawsuit.

17       Q.     Well, let's get into your actual report, I guess.

18  Page 1, you start listing the materials that you've reviewed.

19  Have you listed everything that you've reviewed?

20       A.     I believe so.

21       Q.     As you reviewed this case, was there anything

22  that you didn't have that you would have liked to have had?

23       A.     No, sir, not--there wasn't anything that I

24  believed was available that I--I would have wanted to have.

25       Q.     Have you brought your file with you today?

1          A.      No, sir.

2          Q.      Okay.  What have you brought?

3          A.      I have a copy of my report.

4          Q.      So you don't have any of the materials that you

5    reviewed?

6          A.      No, sir.

7          Q.      Did you learn that in law school?  You know I'm

8    joking.

9          A.      No, I--I learned that it's a pain in the butt to

10   go to the room and get the box out and carry it up the stairs.

11         Q.      I understand.

12         A.      So unless I don't have to, I don't.

13         Q.      When it's important--nowadays, if it's important

14   to bring the file, I'll send a notice out and tell you to

15   bring the file, so--because nobody brings them anymore unless

16   you tell them you'd better bring them.

17         A.      We will get, I think, to the day that--I did this

18   presentation yesterday, and I just--I realized for whatever

19   reason this morning, I put my stuff in my pocket.  And I've

20   got this little thumb drive, you know.  My whole

21   presentation's on this thumb--we're going to get to the point,

22   I think, that there isn't going to be any more paper, but

23   we're not there yet.

24              MR. McMILLAN:  Not soon enough for me.

25              Could we take a short break?

1            MR. BEDNARZ:  Sure.

2            (Recess taken, 10:02-10:10 a.m.)

3       BY MR. BEDNARZ:

4       Q.    Starting on page 3 of your report, No. 1, it

5   says, ". . . I have relied upon the documents, diagrams,

6   pleadings, records, reports, and statements previously

7   provided"--or "previously described.  I have formed a number

8   of opinions based upon the aforementioned as well as my

9   experience, education, and familiarity with professional

10  publications."  It goes on to say, "I have relied on a variety

11  of publications . . . ."  Which--which publications have you

12  relied on in this case for your opinions?

13      A.    As I formed my opinions--formed my opinions in

14  this case, there would have been some that I actually would

15  have referred to and then some that--just in general

16  knowledge.  And that would include training material for the

17  Taser courses that are taught, Taser courses that I teach,

18  training material published by Taser International, as well as

19  I've written a couple of articles, and done policy work in the

20  area of police service dog use and Taser use.

21      Q.    Would you consider your articles authoritative,

22  reliable?

23      A.    As a general proposition or in specific articles?

24  There are some that I have written that are--are not meant to

25  be authoritative but rather to give a broad background and

1    illustration of a particular device or technique, to be more

2    of a survey article.  There are others that are--I've done a

3    lot of review articles which are a right pain in the academic

4    brain.

5         Q.    Have you done any law review articles that are

6    relevant to the issues in this case?

7         A.    Do you mind if I just take a look at the--

8         Q.    Uh-huh (Affirmative).

9         A.    --list?  I think I've given you ten years

10   of . . .

11         Yes.

12        Q.    And which ones are those?

13        A.    Starting at the very end of the publication list,

14   "Police Canine Risk Management," which was published by The

15   Municipal Lawyer.  It's not an academic institutional law

16   review, but it is a peer-juried, peer-reviewed legal

17   publication published by the International Municipal Lawyer

18   Association.  That was published in July 2002.

19        I did another article for that same journal in

20   July 2009.  I--the title of that article is, "The Risky

21   Continuum: Abandoning the Use of Force Continuum to Enhance

22   Risk Management."

23        As we sit here today, Mr. Bednarz, I don't recall

24   the detailed text of either article.  But that general subject

25   matter would impact some of the issues you've already

1   mentioned and some of the issues I've discussed in--in my

2   report.  And that latter article that I cited, "The Risky

3   Continuum," is one that I presently have an article out for

4   peer review that follows up on that article. And it generally

5   talks about use of force issues.

6       Q.     So The Municipal Lawyer is a peer-reviewed

7   publication?

8       A.     Yes.  It's a lawyer--I don't know if peer's the

9   right word, but they have a board of lawyer--editors that are

10  lawyers that do the Bluebook and the substantive fact checking

11  and all that sort of thing associated with an academic

12  institution's law review.

13      Q.     Any other things that you would--any other

14  publications you would consider peer-reviewed?

15      A.     On this list?

16      Q.     Yes.

17      A.     Let me . . .

18             Yes.  Publications or just articles?

19      Q.     Both.

20      A.     Yes.

21      Q.     And which ones?

22      A.     The K9 Officer's Legal Handbook.  Lexus-Nexus has

23  both copy editors, substance editors, and legal editors.

24             The other book listed there, Street Legal, A

25  Guide to Pre-Trial Criminal Procedure for Police, Prosecutors,

1  and Defenders--the American Bar Association has a very

2  rigorous legal editing board.

3          The ALEL--excuse me--AL--AELE--sorry--there was a

4  bit of dyslexia--Monthly Law Journal is peer-reviewed, but the

5  topic of that article, sir, has really nothing to do with

6  anything in this litigation.

7          The Corrections Manager Report is peer-reviewed,

8  but again, that article has nothing to do even remotely with

9  the topic of this litigation.

10          And then the book, Life in the Law, published by

11  BYU Press, was peer-reviewed.

12      Q.    Would any of those publications be what we call

13  authoritative and reliable?

14      A.    I believe that they would all meet that

15  definition.

16      Q.    Can you remember any publications that you

17  specifically reviewed for this case?

18      A.    Yes.

19      Q.    Which ones are those?

20      A.    I reviewed my--as a Taser instructor, I use the

21  Taser provided curriculum supplemented with my own material.

22  And I reviewed my material from Taser Version 14.0.

23          I also reviewed--I reviewed a couple of books.

24      Q.    Which ones are those?

25      A.    Well, I knew that question's coming, so I'm

1  thinking about them.  I don't remember whether I reviewed--I

2  reviewed a book by Dr. Vincent DiMaio--D-i-M-a-i-o--and his

3  wife.  What's her name?  I've forgotten her name.

4       Q.     Teresa?

5       A.     Teresa.  And I don't recall whether I reviewed

6  that book in the context of this case or another, but it would

7  have been about the same time.

8       Q.     Okay.

9       A.     And then there is a book on conducted energy

10  weapons, electronic control devices with a number of coauthors

11  that I believe that I--I reviewed one of the chapters with

12  respect to Taser injuries.  And I don't--I don't--it's--it's

13  a--

14       Q.     Blue book?

15       A.     --a blue book.  And Dr. Ho is one of the editors.

16  Dr. Ted Chan.

17       Q.     All the good Taser experts, right?

18       A.     Oh, gosh.  The other guy from UCLA.  Yes.

19       Q.     Dawes?

20       A.     If you told me the title, I would--it's blue.

21       Q.     Yeah.

22       A.     Yeah.  Apparently you know the book I'm talking

23  about.  It costs a lot.

24       Q.     Well, let's get into the facts a little bit.  The

25  last paragraph on page 3, you talk about Hill and Ford found

1  Woodward on Long Hollow Pike, while Shockley, King, and Alvis

2  went to the Rutter home.  "Ms. Rutter told officers that

3  Woodward made the emergency call and she was not, in fact, the

4  victim of a home invasion.  [And] she told the officers that

5  Woodward had been using drugs, including a recent

6  methamphetamine binge, and that he had been acting bizarrely."

7          Then the next paragraph:  "At the same time,

8  Officer Hill was speaking with Woodward a short distance

9  away."

10         Do you know if those are happening at the exact

11  same time or how they unfold?

12     A.     I believe they're substantially contemporaneous.

13  I don't know that it was precisely contemporaneous.

14     Q.     Do you know when Hill and Ford got the

15  information that the mother was okay and that he was on drugs?

16     A.     I believe I may have seen that in the reports,

17  but as I sit here today I don't recall precisely what moment

18  that happened.

19     Q.     Now, in the next paragraph, where it talks about

20  Officer Ford arrived at that point to back up Officer Hill you

21  say, ". . . Woodward appeared to be possibly intoxicated and

22  he was somewhat agitated, [but] officers reported nothing

23  beyond the emotional agitation that one might expect to see in

24  the victim or witness of a home invasion and kidnapping."

25         Have you read the depositions of Ford and Hill?

1       A.      Yes, sir.

2       Q.      You know--do you remember when they were talking

3   about he was geeking out?

4       A.      I don't remember whether they both used that

5   term, but I remember the term because it struck me as

6   colloquial.

7       Q.      Explain that for me.

8       A.      "Geeking out" is not a--was not a--was not--is

9   not a term that has a precise meaning to me.

10      Q.      So you would have to rely upon them to define

11  that term for you, I guess?

12      A.      It would--it would be helpful if they used a term

13  that was more susceptible to common meaning.

14      Q.      Okay.  I'm going to try to skip through this or

15  we'll be here all day, but next paragraph down, you say ". . .

16  Ford needed to remain at the Rutter Woodward home to continue

17  his investigation. . . ."  Why would Ford have to stay?

18      A.      Ford--at this point, Ford was--that's--that's the

19  role that he had assumed, been delegated to in the course of

20  the investigation.  It could be possible that someone else

21  could--could have taken over that responsibility, but that's

22  the way the circumstances unfolded.

23      Q.      Okay.  We had three officers go to the home.  He

24  wasn't one of them, right, initially?

25      A.      Initially, correct.

1      Q.      And then Officer Hill was the first one that

2   encountered him walking down Long Hollow Pike, correct?

3      A.      Officer Hill was the first one that encountered

4   Mr. Woodward, correct?  Is that what you're referring to?

5      Q.      Yes.

6      A.      Yes.

7      Q.      So why is it necessary that Ford remain at the

8   house?

9      A.      Again, it is possible that someone else be

10  designated to stay at the house, but that was the role in

11  which Officer Ford was--was placed and he's the one who's

12  actively undertaking the investigation, getting the

13  information for the report.

14     Q.      Are you critical at all of Officer Ford for

15  putting Woodward in the back of his police car without putting

16  cuffs on him, without searching him?

17     A.      I'm not critical at all for putting him in the

18  back of the police car at that point without handcuffing him.

19  That's--that's a--at this point, that's an issue that I think

20  many officers would not have handcuffed Mr. Woodward as they

21  put him in the back of the car.

22             The searching typically is incidental to the

23  handcuffing, not always, so no.

24     Q.      Okay.

25     A.      It could have unfolded differently, but in this

1    case, no.

2        Q.      You've got a man that's been using drugs.  He's

3    obviously under the influence of something when they

4    encountered him.  He's walking down the street with a large

5    knife.  Wouldn't that make you concerned as a police officer

6    that maybe he's got another weapon?

7        A.      It could.

8        Q.      The end of the paragraph, you say, "Woodward

9    showed no signs of a medical emergency or violent resistance."

10    What are the signs of a medical emergency?

11        A.      Signs of a medical emergency can be widely

12    divergent and it can be just a wide array of symptoms, but Mr.

13    Woodward didn't show any signs at this point that a police

14    officer would typically interpret as leading the officer to

15    believe that this--that Mr. Woodward was experiencing a need

16    for urgent medical care.

17        Q.      What should an officer be looking for at that

18    point?

19        A.      At--

20        Q.      In terms of assessing whether or not there's a

21    medical emergency?  How do you make that determination?

22        A.      Well, I suppose the most common thing that an

23    officer would look for is the person showing some kind of an

24    injury.  So Woodward is reporting that there had been--I

25    believe it was two or three black men that had invaded his

1   home.  First thing cop's going to look for:  Is there some

2   external injury?  Is he bleeding?  Has he been punched?  Has

3   he got a broken nose?  That sort of thing.

4        Q.     And at this point, you're assuming that the

5   officers believed what he was telling them?

6        A.     I have no reason to assume otherwise at this

7   point.

8        Q.     Do you know what they testified to, Ford or Hill,

9   in their depositions about whether or not they believed what

10  he was saying?

11       A.     I don't recall what their testimony was--what

12  they thought at this particular--at the point that there's the

13  placement in the back of the car.

14       Q.     If they didn't believe what he was saying, does

15  that change anything about putting him in the back of the

16  police car without searching him or handcuffing him?

17       A.     Not necessarily.

18       Q.     Why not?

19       A.     They made a judgment call based on what they had

20  observed, what they'd observed about his behavior, what they'd

21  observed about whether he was injured or not, what they

22  observed about whether he had any visible weapons, what they'd

23  observed about his reporting.  And I'm not critical of the

24  result of that judgment call.

25       Q.     Would a medical emergency include a mental health

1   crisis?

2       A.    It could.

3       Q.    And what are the signs of a mental health crisis?

4       A.    And much like a medical emergency, those signs

5   can be widely divergent.  And for example, my spouse, who's a

6   trained medical professional, might see something very

7   different than the same behaviors I would as a law enforcement

8   officer. For a law enforcement officer, typically the signs of

9   a mental health crisis are going to be, you know, signs that

10  are fairly profound and observe--than something that a

11  layperson might observe.

12      Q.    Well, officers are trained or should be trained

13  to recognize a medical emergency and/or a mental health

14  crisis, aren't they?

15      A.    Officers receive training in both first aid and

16  in dealing with persons with mental--in mental crisis.  I

17  won't say with mental illness, because that's--that's pretty

18  darn broad.

19      Q.    What signs would they be taught to look for?

20      A.    Again, the officer at the scene is going to be

21  most concerned with physical manifestations:  Is this person

22  acting out?  You can have a person who is profoundly mentally

23  ill, but who doesn't really act out.  And even if they're

24  acting out, there can be a wide range there.

25      You might have somebody who is--I recall one

1  call, for example, where a person was experiencing a deep

2  mental health crisis and was sitting in a corner balled up and

3  almost catatonic as contrasted with--with another person that

4  I dealt with, who insisted that there were alien invaders

5  surrounding us and ended up attacking me because she perceived

6  I was one of those alien invaders.  But the cop on the

7  street's got to look for the external behavior.

8      Q.    So she was delusional?

9      A.    She was.  I was not an alien.

10     Q.    Is delusion one of those things you look for?

11     A.    It is--it is.  Again, it depends on delusions and

12  the profundity of the delusions, but it is something you look

13  at.

14     Q.    Is there a source we could go to if we wanted to

15  say these are potential signs of a medical crisis or mental

16  health crisis?

17         MR. McMILLAN:  I'm going to object just to the

18  vagueness of--I mean, any source in the world?  I mean, I'm

19  not sure . . .

20     BY MR. BEDNARZ:

21     Q.    You can answer.

22     A.    I think that--I could speak with some authority

23  with respect to the curriculum, for example, at the Utah State

24  Police Academy.  I can't with respect to the police academies

25  operated in the state of Tennessee.  But typically, officers

1   are trained in first aid in their police academy experience.

2   Typically, you know, one of the more common medical

3   emergencies that police officers deal with, you know, heart

4   attacks and so forth.  So typically, they have cardiopulmonary

5   resuscitation courses.  And typically, there are at least

6   survey courses presented in police academies with respect to

7   acute mental health crises.  And many times, that's a subject

8   of in-service training in a police agency.  So with respect to

9   sources, you know, I think that we would--we would look to

10  basic police training and then in-service training offered to

11  police officers.

12       Q.    Okay.  Are you familiar with that training at the

13  Utah state academy?

14       A.    I don't--I'm familiar with it.  I've attended it.

15  I don't teach it.

16       Q.    What do they teach in terms of looking for mental

17  health crisis?

18       A.    Excuse me.  Honestly it's been long enough that I

19  can't really--I can't really tell you.  I know that there are

20  courses unfolding even now in crisis intervention, but I'm far

21  enough removed from being . . .

22       Q.    How about excited delirium?  What are the signs

23  somebody may be experiencing excited delirium?

24       A.    Officer taught--about this phenomenon on excited

25  delirium, which some medical professionals say is a diagnosis;

1    others say it is not, but there are some significant signs

2    that are commonly taught to officers.  For example, someone

3    who is--some of the more significant signs, someone who's

4    hyperthermic--they're very hot to the touch, they are sweating

5    noticeably and visibly.  And that hyperthermia, coupled with

6    mental health issues, often causes people to disrobe.  That's

7    one of the very most common and very most commonly presented

8    signs of excited delirium.

9            Another is that a person under--in a state of

10   excited delirium would be aggressive toward glass,

11   particularly light--lighted glass or aggressive toward large

12   reflective glass, plate glass windows and so forth, would

13   actually charge at shiny glass and illuminated glass that a

14   person, even in a state of being disrobed and--even in a state

15   of being disrobed when--when the ambient temperature is cool,

16   that that person would be slippery and wet to the touch.

17           Growling or guttural noises, guttural speech,

18   deep bass speech is a significant sign of--and when I say

19   speech, I mean, you know, animal-type sounds is a significant

20   sign associated with excited delirium.

21           Certainly some form of delusions.  A number of

22   cases where I have seen behaviors that medical professionals

23   would later have characterized as excited delirium involved a

24   person believing, in one case, that he was the destroying

25   angel as mentioned in the Bible, another person being--

1    believing that he was the Messiah.  Strength that is described

2    as being superhuman in nature is a common and significant sign

3    of excited delirium.

4              And Mr. Bednarz, as I'm using the--I don't recall

5    if your question was clues or symptoms or signs, but as I'm

6    using those terms, I'm using them interchangeably.  I'm not

7    using them from a perspective of a medical professional,

8    because frankly, you know, physicians disagree on whether this

9    is an actual diagnosable syndrome or not.

10        Q.     I'm asking from the perspective of a police

11   officer.

12        A.     And that's what I'm trying to communicate to you,

13   sir, is what cops are taught and not necessarily what an

14   academician in the medical community would tell you.

15        Q.     Would agitation be one?

16        A.     Agitation often is.

17        Q.     Confusion?

18        A.     It can be.

19        Q.     And I think what you were describing just now,

20   delusions?

21        A.     Particularly delusions about one's self-identity

22   and self-orientation.

23        Q.     And then at the bottom of the page, you talk

24   about ". . . Perry began to search Woodward. . . . Shortly

25   after Perry touched him and without apparent reason, Woodward

1    instantly became enraged . . . ."  Well, there was an apparent

2    reason, wasn't there?

3         A.    I'm sorry?

4         Q.    There was an apparent reason that he became

5    enraged, wasn't there?

6         A.    It--I don't want to quibble with words, but there

7    was a--there was an action.  Perry, first, as a cop, typically

8    would, said, Look, in a very friendly tone--I can't remember

9    his exact words.  He said something like, Let me search you.

10   Let me frisk you.  I'm going to touch--I'm going to pat you

11   down, I think is what he said.

12        Q.    Well, we know what--well, I don't want to cut you

13   off.

14        A.    I'm sorry.  And then there's a touch.  When I say

15   without apparent reason, that typically would not be a cause

16   for someone to become enraged and become combative.

17        Q.    But we know why he did in this case, right?

18        A.    Well, that's the theory.

19        Q.    He--

20        A.    Sure.

21        Q.    --thought something was put in his pocket?

22        A.    That's what he expressed.

23        Q.    And that's part of--I guess that's--means he was

24   delusional?

25        A.    I don't believe that Officer Perry--I believe

1   that Mr. Woodward thought that Officer Perry put something in

2   his pocket.  And I don't believe Officer Perry did that, so

3   you can call that a delusion.

4        Q.    Do we know for sure?

5        A.    You call it a mistake of, you know, feeling a

6   finger and thinking:  Something just went in my pocket.

7        Q.    Do we know for sure whether or not he put

8   anything in his pocket?

9        A.    I do not.

10       Q.    We have to rely upon what the officer says in

11  that case, I guess?

12       A.    That's the best available information to me.

13       Q.    Do you know if anything was ever found in his

14  pocket?

15       A.    Sir, I may have seen the contents of his pockets

16  listed somewhere in autopsy or medical records, but if I did,

17  I do not recall them.

18       Q.    It says, ". . . Woodward instantly became

19  enraged . . . ."  Tell me what you mean by the word enraged

20  and how he became enraged.

21       A.    His comportment, his behavior went from someone

22  who, to this point, had been pretty cooperative, had been

23  engaging the officers in dialogue, had been cooperative with

24  the direction given by the officers.  And he became a very

25  highly aroused, emotionally aroused--agitated, I think, was

1    the word you used.  And I would say very agitated in that he

2    began to contort, to twist, to push and pull away.  His voice

3    went up.

4        Q.    Okay.  Enraged means like angry, doesn't it?  Do

5    you think that's a proper word, enraged for what was going on?

6        A.    I think we could talk about different words, but

7    as I looked at the video and as I read the reports, that's the

8    word that came to my mind.

9        Q.    And it says he quickly became combative.  How do

10   you use that word and what do you mean by he became combative?

11       A.    He became actively and physically resistant to

12   the officers' efforts to control him.  He became--he began to

13   struggle and twist, as you can--as you can see in the video,

14   to pull away from--from the officers, to torque or to move his

15   body in a resistive way.

16       Q.    Now, do--when you looked at the video and Officer

17   Hill tells him, Calm down or we're going to use the Taser, did

18   you see Officer Hill pointing the Taser at him?

19       A.    I did see the Taser pointed at some point, but I

20   don't--I'm not sure, sir, exactly at what point.

21       Q.    Do you ever remember the red light being on him?

22       A.    I believe so.

23       Q.    Okay.

24       A.    It's been several months since I looked at that

25   video.

1     Q.     Yeah.  Have you seen anything to suggest that the

2   red light sometimes makes people that are under the influence

3   of drugs--it scares them and they run?

4     A.     I have not.  I suppose that's a possibility.

5     Q.     Now, officers are required to use the least

6   amount of force to accomplish the task, correct?

7     A.     Officers are required to use a reasonable amount

8   of force.  That's often the least amount.

9     Q.     Is there any reason Officer Hill couldn't have

10   just grabbed the other arm rather than pull his Taser out?

11     A.     That's something that was certainly within the

12   realm of possibility.  Now, it may not have been the best

13   judgment call based on what Officer Hill saw, but that's

14   certainly something that is within the realm of possibility.

15     Q.     And according to the force continuum at Gallatin

16   Police Department, grabbing his arm would have been lower on

17   the continuum than the Taser?

18     A.     It might--might have been.  I've seen fairly

19   significant injuries result from grabbing an arm and, in fact,

20   suffered a very significant injury and have metal pieces in my

21   shoulder today as we speak from a very similar grabbing of the

22   arm.  I would have preferred a Taser.

23     Q.     Tell me about the Taser training that these

24   officers received.  Is it similar to what you teach?

25     A.     It was.

1      Q.      And then I noted in your report that you

2  indicated that both of these officers scored 100 percent on

3  the test that's given after the course?

4      A.      I believe that's--I'd want to go looking through

5  the training records, but I believe they did score 100

6  percent.

7      Q.      Do you know if these officers were provided with

8  the answers to the test?

9      A.      I would expect that the answers were discussed in

10  the material.  That is, if they had been paying attention in

11  class, they should have heard, you know, the answer. There's

12  things like nomenclature, operation of the Taser. It would be-

13  -a good instructor should present all of the material that's

14  tested on in the course of the Taser training course.

15      Q.      Do you know if they get to use their notes when

16  they're taking this test?

17      A.      When I teach the course, they don't get to use

18  their notes and that's the prescription.  I don't know what

19  happened in this particular--

20      Q.      Okay.

21      A.      --course.

22      Q.      Have you looked to see if everybody at Gallatin

23  scored 100 percent on their test?

24      A.      I did not.

25      Q.      Okay.  Would you think an officer that completed

1   that training would know the optimal--optimal distance for

2   deploying a Taser?

3       A.      An officer who completed that training should

4   understand the impact of distance and--and effectiveness of

5   the Taser.  Optimal, sir, can depend on some different

6   circumstances.

7       Q.      Okay.  Well, you teach that the Taser shouldn't

8   be fired--it's less effective if fired within three feet of

9   the suspect, don't you?

10      A.      The closer the suspect, typically--typically, the

11  less of the probe spread.  That can change with body angles,

12  but typically that's the case.  And less of a probe spread,

13  the less musculature that is impacted, typically.

14      Q.      Did you read Officer Hill's deposition where he

15  believes the closer the probes are, the more effective it is,

16  the more incapacitation you have?

17      A.      I believe I read something.  Whether it was

18  Officer Hill's deposition or not, I do not recall.  I'd have

19  to go back and look and see if that was said in his

20  deposition.

21      Q.      Is that an indication that the training wasn't

22  effective for an officer to be that wrong about something like

23  that?

24      A.      Not necessarily.  It may be that he misspoke in

25  his deposition or he may have been confused by the question or

1   he may have had an misapprehension of what the instructor said

2   or he may have just plain forgot.

3        Q.    Do you remember from that deposition, I asked it

4   three or four different ways and got the same answer?

5        A.    I remember something, but I'm--I'd want to see

6   the deposition, but I--

7        Q.    Do you remember me sounding surprised when he

8   said that?

9             MR. McMILLAN:  Objection to--witness wasn't there

10   to hear you sound any way.

11            THE WITNESS:  Yeah, I remember the discussion,

12   sir.  I'll just leave it at that.

13        BY MR. BEDNARZ:

14        Q.    That was a good question.

15        A.    That was a good question, sir.

16        Q.    A well-trained officer should know that when you

17   use a Taser, the wider the spread, the more effective it's

18   going to be, correct?

19        A.    Okay.  Now, that's not an absolute.  But as a

20   general proposition, the wider the spread across major muscle

21   groups, assuming that the deployment is successful, then--then

22   the Taser is more effective at achieving neuromuscular

23   incapacitation?

24            (To the reporter) Do you need that spelled?

25            THE REPORTER:  (Moves head from side to side.)

1          THE WITNESS:  Okay.

2      BY MR. BEDNARZ:

3          Q.     Then you go on to say, "Woodward bolted from the

4      officers and ran into a shallow, grass-lined ditch.  He

5      stumbled, rose, and ran again, breaking the Taser wires." When

6      did the Taser wires break?

7          A.     I can't ascertain precisely when they broke.

8          Q.     Okay.  Do you know if they broke before the first

9      cycle ran?

10         A.     I do not.

11         Q.     Do you know if they broke before the second

12     trigger pull and the second cycle?

13         A.     I don't know that for a fact.

14         Q.     Would you agree that Woodward goes down

15     simultaneously with the trigger pull, the first one?

16         A.     It's pretty darn close.

17         Q.     Okay.  Would you agree he was on the ground for

18     five seconds?

19         A.     I don't recall that I timed it then.  And I don't

20     recall that now.

21         Q.     Would that be important in trying to figure out

22     whether or not this Taser was effective and worked properly?

23         A.     It could be a factor.

24         Q.     Do you know what Officer Perry was doing during

25     this five-second cycle?

1    A.    I don't recall Officer Perry's position at that

2    point.

3    Q.    Do you remember seeing the video, seeing Officer

4    Perry standing back watching and giving commands to roll over?

5    A.    No.  I remember someone giving commands.  I don't

6    recall--I--I believe that it was Officer Perry.  I'm not

7    certain.

8    Q.    Okay.  Does Taser training teach that when the

9    suspect goes down, this five-second cycle is a window of

10   opportunity and the officers should move in and try to get

11   custody of the suspect, get control of the suspect?

12   A.    That would be an--under optimal circumstances

13   that would be best to handcuff under--within that window of

14   opportunity.

15   Q.    And that's because after the five-second cycle

16   runs, the neuromuscular incapacitation stops and they can get

17   up and move again?

18   A.    Full neuromuscular incapacitation does stop at

19   the moment that the energy cycle ends.  And typically, a

20   person is able to move at that point or shortly thereafter.

21   Q.    And would you agree that a Taser does not take a

22   suspect into custody?

23   A.    I would agree with that.

24   Q.    It doesn't matter how many times you pull the

25   trigger, you're not going to get him into custody unless

1   somebody moves in and takes control of him?

2        A.      Not as I would use the term custody, no.

3        Q.      I guess I used the wrong word.  I guess that--

4   yeah.  I told you I didn't get much sleep, so every once in a

5   while, I may go brain dead.

6        A.      I'm pretty sure you've got more than me.

7        Q.      Let's see.  Now, while this five-second cycle is

8   running and there's no neuromuscular incapacitation, a suspect

9   can't follow orders and roll over, can they?

10       A.      Often a suspect cannot.  Sometimes a suspect can.

11       Q.      Did you look at the video to see if Woodward

12  might have been trying to roll over and follow the commands?

13       A.      I couldn't tell whether he was trying to roll

14  over and follow the commands or not.

15       Q.      And we'll look at it in a few minutes, but I'm

16  just trying to see what you remember.

17               Did you see Woodward up on the hood of the car

18  later on?

19       A.      Yes, sir.

20       Q.      And do you know if the second Taser application

21  came while he was on the hood of the car?

22       A.      I don't recall.  I don't believe so.

23       Q.      Do you know what made him fall off of the car?

24       A.      I do not know.

25       Q.      It says, "The Taser touch mode deployments

1    appeared to have no effect."  What do you mean by that?

2        A.      That when the Taser was applied to him in touch

3    mode, it did not appear to impact his behavior.

4        Q.      You're not suggesting that it ought to have

5    neuromuscular incapacitation in the touch mode, are you?

6        A.      It--in certain circumstances, it can.

7        Q.      And if one of the probes is still embedded, it

8    can?

9        A.      Yes, sir.  Embedded or within contact--contact

10   distance.

11       Q.      So both probes don't necessarily have to be in

12   the skin--

13       A.      Correct.

14       Q.      --for the Taser to work?  Somewhere in here you

15   say that the Taser was making a loud sound.  You know what I'm

16   talking about?

17       A.      I don't know where it says it, but I know what

18   you're talking about.

19       Q.      Okay.  And I think you say that that's a sign

20   that it was not working properly?

21       A.      It--that is a sign that it's not working

22   properly.

23       Q.      Okay.  Does it also make a loud sound in the

24   touch mode?

25       A.      In touch mode, it's typically more audible than

1   it is in probe mode, but it's not as loud as the clacking or

2   the rata-tat-tat arcing when there's not actual contact.

3       Q.      Now, if you've got one probe embedded in the skin

4   and the other probe is just in contact, do you still get the

5   loud sound, arcing sound?

6       A.      One probe embedded in the skin and the other

7   probe in contact with what?

8       Q.      Well, that's your phrase you used a while ago--a

9   while ago, I believe.

10      A.      When you say embedded, the Taser may have effect

11  without actually being embedded in the skin.  It may be

12  embedded in an item of clothing, for example, or a--sometimes

13  even in a fabric or a leather or false leather belt.

14      Q.      Sometimes just laying next to the suspect on the

15  ground, too?

16      A.      That's pretty unusual, but that can happen.

17      Q.      Okay.

18      A.      So when--when I--when I said contact, I just

19  wanted to distinguish between the barb of the probe--have you

20  seen the end of the probe, the--

21      Q.      Yeah.

22      A.      --being different from the barb of the probe

23  actually having penetrated the flesh and the flesh.

24      Q.      In those cases when it hasn't penetrated the

25  flesh but it's still effective, do you get the loud arcing

1  sound?

2       A.     Typically not.

3       Q.     But sometimes do you?

4       A.     You do, but again, that--if you get a loud sound,

5  that's a sign that you aren't actually having current

6  delivered--

7       Q.     Okay.

8       A.     --to the person.

9       Q.     And if you have one probe in the suspect and then

10  you apply a touch stun, it works the same as if you've got two

11  probes on him, correct?

12       A.     Optimally, it should.

13       Q.     And in that case, would you have the loud sound?

14       A.     Again, typically, it would not be--you may hear

15  an audible difference, but it would not be that loud clacking

16  sound that you would hear like you hear on television when

17  somebody's demonstrating a Taser.

18       Q.     When you say typically, sometimes you do get the

19  loud sound?

20       A.     I've personally never witnessed it.  I have been

21  told by one individual that it happened to that person.  I

22  don't know whether the person was actually receiving current

23  or not, though.

24       Q.     Let's talk about Alex.  It says, "Alex was able

25  to push open the center door of the car kennel, jump out [of]

1    the front passenger window from Officer Hill's patrol car and

2    run up to Woodward."  Are you sure it was the window he got

3    out of?

4         A.      Meaning the front passenger window?

5         Q.      Yeah.  Have you seen anything to indicate that

6    maybe the door was open?

7         A.      I believe that it was a window.

8         Q.      It says, "Officer Hill commanded Alex to move to

9    a bark-and-hold position . . . ."  At what point did he do

10   that?

11        A.      He's--Officer Hill gives that verbal command

12   after there has already been a bite, after Alex has gotten out

13   of the car, has come up to Woodward and has bitten Mr.

14   Woodward.

15        Q.      What else was going on at the time that he bit

16   him?

17        A.      Well, you still had the officer struggling to try

18   and control Mr. Woodward at that time.

19        Q.      Do you know what position Mr. Woodward was in

20   when the dog bit him?

21        A.      I don't remember.

22        Q.      Do you remember where he bit him?

23        A.      I'd have to go back and look at the pictures.

24        Q.      Back of the thigh refresh your recollection?

25        A.      Well, it was in the leg, but I'd have to--I'd

1   have to take a look.  And if you say it's the back, then I

2   think that's correct.

3       Q.     If he's on the ground and he's bit on the back of

4   his thigh, would that suggest he's facedown at the time?

5       A.     Either facedown or turned on his side.

6       Q.     And--

7       A.     It would suggest that he's not on his back.

8       Q.     And he's got his hands cuffed behind his back,

9   too?

10      A.     At this point, he does.

11      Q.     Did Officer Hill encourage the dog in any way

12  while he was biting Mr. Woodward?

13      A.     I don't recall any commands that I would

14  interpret as encouragement.

15      Q.     Do you remember repeated statements, Good boy,

16  good boy?

17      A.     That--that doesn't necessarily encourage a bite.

18      Q.     Okay.  Okay.  What does it do?

19      A.     It may simply reinforce the dog is being obedient

20  or it may keep the dog focused on the suspect rather than have

21  the dog turn the focus to the officer.

22      Q.     Do you know how long he went on with Officer Hill

23  saying, Good boy, good boy?

24      A.     I don't.  I don't recall the timing.

25      Q.     I hate to do this, but I've got to take a short

1    break.

2         A.      I was hoping you would.

3              (Recess taken, 11:03-11:11 p.m.)

4    BY MR. BEDNARZ:

5         Q.      Paragraph (b), you say, "Gallatin Police

6    Department officers' detention of Woodward was consistent with

7    actions of reasonable, well-trained officers and was

8    consistent with generally accepted police policies, practice,

9    and training."  When you say generally accepted policies,

10   practice, and training, what do you mean?

11        A.      We don't have, in the United States, a national

12   police force.  We have tens of thousands of police agencies

13   ranging in size from two and three officer departments.

14   Majority of the agencies in this country are fewer--have fewer

15   than 15 officers all the way up to organizations such as the

16   New York Police Department, with tens of thousands of

17   officers.  So there isn't a national standard, but there is, I

18   believe, a general agreement as manifested in policies that

19   are commonly accepted throughout the United States that I

20   think is fair to define as generally accepted policies,

21   practices.  And the same thing could be said of training.

22   While training varies from state to state, there is a general

23   core foundation of training.

24        Q.      And in reaching that conclusion, do you look at

25   things like the model policies put out by the International

1    Association of Chiefs of Police or is there--are there sources

2    you rely upon?

3         A.    There--there are a number of model policies.

4    International Association of Chiefs of Police promulgates

5    model policies.  There are a couple of firms out there that

6    sell model policies.  There are model policies promulgated by

7    prosecution groups, by municipal risk management pools, and so

8    forth.  So sure, all of those might be a source to look to for

9    what is generally accepted.

10        Q.    Would the actions consistent with--well, what

11   standards govern the conduct of police officers?

12        A.    Where?

13        Q.    In this country.

14        A.    Each individual state will have its own state

15   licensure or certification standards.  Each agency will

16   promulgate its own standards of conduct.  In some states,

17   there are state statutes that govern standards of conduct.

18   Certainly at the judicial level, we have pronouncements from

19   the United States Supreme Court, federal courts of appeal,

20   state supreme courts, other lesser courts that establish

21   standards of conduct for law enforcement officers.

22        Q.    Paragraph 1, it says, "When the officers learned

23   from Sandra Rutter that she was not the victim of a home

24   invasion and kidnapping, the officers knew that there was

25   probable cause for an officer to believe that Woodward had

1    committed one or more violations of TCA 39-16-502, [which is]

2    false reports."  And then you go on to state that's a felony.

3    Is that a felony in Tennessee, making a false report?

4         A.    That's--that's my understanding, that a violation

5    of that statute is a felony.

6         Q.    Is it a serious crime?

7         A.    I'm not sure what you mean by serious.

8         Q.    Well, at the same time that they found out that

9    she wasn't the victim of a home invasion and kidnapping, the

10   officers also knew that Mr. Woodward had been doing drugs?

11        A.    They--they learned that from--Mr. Woodward's

12   mother told them that the same general time frame, yes.

13        Q.    They also learned that he was delusional and

14   confused?  They knew by then?

15        A.    Certainly had indications of that, yes.

16        Q.    Paragraph 3:  "A reasonable and well-trained

17   officer would have arrested Woodward for violation of these

18   statutes."  Would they have done that even if he was in the

19   middle of a medical crisis?

20        A.    Not necessarily.

21        Q.    For instance, if he had a bullet in his chest,

22   they wouldn't have, right?

23        A.    I would expect not, although it could happen.

24        Q.    Okay.  Don't they have enough information at this

25   point to know that he needs medical help?

1        A.      I don't believe at this point that it was obvious

2   that he had a medical condition.

3        Q.      When did it become obvious?

4        A.      I'm not certain when it became obvious to the

5   officers.  There is a point at which--I believe that Officer

6   Ford was the first to request medical attention.  I'm not sure

7   who the first--I don't recall.

8        Q.      Okay.

9        A.      I need to look through here.  But at some point,

10  you've got three different officers calling for medical

11  attention.

12       Q.      And all of those occurred after the struggle,

13  correct?

14       A.      Right after some struggle, yes.

15       Q.      Same paragraph, you say, "At the time Woodward

16  was arrested, he was not in apparent mental health crisis."

17  When do you consider--when was he arrested?

18            MR. McMILLAN:  I'm sorry, Joe.  Which paragraph

19  are you on?

20            MR. BEDNARZ:  Paragraph 3 on page 7.

21            MR. McMILLAN:  Okay.  Okay.

22       BY MR. BEDNARZ:

23       Q.      Is there--let me rephrase that.  Is there a

24  difference between detention and arrest?

25       A.      Yes.

1    Q.    In this case, when was he detained?

2    A.    Well, he was certainly--there was an effort to

3    detain him as soon as the officers tried to place him in

4    handcuffs.  Detention is a legal conclusion that--you know,

5    your courts may differ from my view.  It may differ from Utah

6    courts on that.

7    Q.    Is it your opinion that he wasn't being detained

8    when they put him in the back of Ford's police car on Long

9    Hollow Pike?

10   A.    I think a judge in Utah, under some of the case

11   authority we have here, would find that he was not being

12   detained as defined in our fourth amendment and fourth

13   amendment analog here.

14   Q.    Okay.  What about at the time that they arrived

15   at his house and left him in the back of the car with no way

16   to get out?

17   A.    Again, at that point, I think that one could make

18   the argument and I think I could see a judge finding he was

19   not detained.

20   Q.    Okay.  Why is that?

21   A.    Based on some case law that we have here with

22   respect to whether he had expressed any interest in leaving,

23   whether he was appearing to cooperate with the officers in

24   their investigation at that point, what language of command

25   the detention--the officers had his used.  I'm not sure a

1    Tennessee judge would reach the same conclusion because I'm

2    not--not prepared to offer an opinion on Tennessee law.

3         Q.     Okay.  At what point was he considered under

4    arrest, in your opinion?

5         A.     I would consider him to be under arrest when the

6    officers are attempting--putting him in handcuffs and have the

7    intent to take him to--to the detention facility, to the jail.

8         Q.     So that would be the point where--approximately

9    the time where they're taking him out of the back of Ford's

10   vehicle?

11        A.     Approximately that time, yes, sir.

12        Q.     You've got--I don't--I don't want to summarize

13   it.  How does an officer decide which suspects to take to jail

14   and which ones to take for medical treatment?

15        A.     You--you gave me the example earlier of a suspect

16   who had a bullet hole and I mentioned to you earlier someone

17   who had an obvious injury such as a broken nose or bleeding

18   wounds that, you know, any reasonable person would say, Hey,

19   that looks like it requires medical attention.  So there's

20   a--you know, there's a continuum there.  And each circumstance

21   is going to be a little bit different.

22        Q.     Okay.  In your report, you say, "Officers are

23   trained that some incidents initiated as a call for police

24   intervention in an alleged crime may be best resolved by

25   referral for mental health services."  What training do they

1   receive as to which ones are best resolved by mental health

2   services?

3        A.      Officers should be trained in their basic

4   training in the police academy, first off, the premise you

5   mention, not everybody needs to be arrested when there's a

6   call for service.  But there are times when a person's

7   misbehavior, though it might be criminal--it might be found to

8   be criminal, it might be that their need for mental health

9   treatment is more significant, is more apparent, and would

10  take priority over the processing of that person through the

11  criminal justice system, or that the person's criminality

12  could be addressed at a later point in time.  I am assuming

13  that in Tennessee, there is a system similar to most other

14  states; that is, a complaint and summons where a person might

15  have criminal charges filed at a later time through a means

16  other than effecting a custodial arrest and getting them into

17  the criminal justice system through that means.

18       Q.      How does the officer make the decision where to

19  take them?

20       A.      Where to take them?

21       Q.      (Moves head up and down.)

22       A.      As opposed--between a mental health facility and

23  a jail?

24       Q.      Yeah.

25       A.      Well, that's going to depend on a variety of

1    circumstances, a variety of conditions.  For example, does the

2    jail have an assessment for mental health needs?

3            Q.      Okay.  Let me--let me be more specific.

4            A.      Okay.

5            Q.      In this case, did these officers get any training

6    in how to determine who to take to jail and who to refer for

7    mental health services?

8            A.      I don't know what specific training they had in

9    that particular area.  I know they'd received mental health

10   training in the not too--in the relative time frame of this

11   incident, but I do not know the specifics of whether your

12   question was addressed or not.

13           Q.      Okay.  And how would a reasonable, well-trained

14   officer make that decision?

15           A.      Much of it's going to be common sense.  How--how

16   profound are the--how profound are the symptoms that the

17   officer can observe--

18           Q.      Well--

19           A.      --how obvious.

20           Q.      --in some respect, isn't that a medical decision,

21   whether or not this guy needs help?

22           A.      In the same sense that in--in some respect a

23   doctor's going to decide we'll leave a bullet in the body or

24   not, sure.  Some--some wounds, some injuries--physical

25   injuries are going to be more obvious, just like some mental

1    health crises are going to be more obvious.

2         Q.    And don't police officer--officers have to have

3    some kind of training to help them make that decision?

4         A.    Well, the core foundation, we hope they have some

5    common sense and observation skills, but training is certainly

6    going to assist them in making that decision.

7         Q.    Okay.  And as you reviewed the Gallatin Police

8    Department reports, historical reports, you noted cases in

9    which the subject was not arrested but was transported for

10   mental health evaluation and treatment?

11        A.    I--I can remember a few cases.

12        Q.    What reports did you review to find that

13   information?

14        A.    I was given a span of reports, including annual

15   reports, but let me see if I--I'm not sure that I--I think the

16   span was 2007 to 2011.  I was given incident reports that

17   involved calls for service where there had been use of force

18   reports completed.  And I--

19        Q.    So--

20        A.    My belief is, it covered that entire span of 2007

21   through 2011.

22        Q.    Okay.  So would--so you're talking about use of

23   force reports that you got that information out of?

24        A.    Incident reports where there was a use of force

25   reported.

1    Q.  Did you review anything to try to determine what

2 the general orders require in Gallatin in terms of a police

3 officer taking somebody for mental health treatment?

4    A.  No.

5    Q.  Did these officers get adequate instruction on

6 dealing with somebody with excited delirium?

7    A.  I believe so.  The training they had on excited

8 delirium that was included in their Taser training materials

9 is pretty much the foundation that officers across the country

10 get.

11    Q.  Okay.  And that's two and three slides in Version

12 14.0?

13    A.  In Version 14.0, I don't remember how many

14 slides, but there are a couple of videos and there are--is a

15 discussion--was--I guess was would be the best way to put it--

16 a discussion Version 14.0 of the major indicators or symptoms

17 or signs of excited delirium that you've asked me about and

18 we've discussed earlier today.  And then officers are also

19 taught--were taught then and it's still part of that training

20 curriculum now, the core elements of response to excited

21 delirium.

22    Q.  Okay.  So it's your opinion that the training

23 contained in Version 14.0 on excited delirium is adequate

24 training for a police officer in regards to dealing with

25 somebody exhibiting the signs of excited delirium?

1      A.      That training has certainly improved over time

2    and there's more of a discussion now in current training

3    materials, but at the time that these officers were trained,

4    they were trained with the materials that were commonly in use

5    throughout the country.

6      Q.      In regards to dealing somebody--dealing with

7    somebody that has mental health issues, did these officers

8    receive adequate training?

9      A.      I believe they received more training than many

10   police officers do.  I don't have with me the training

11   records, but I believe all of the officers involved in this

12   particular incident actually had been to some specialized

13   in-service training dealing with mental health incidents

14   within a relatively short time prior to this particular--

15   particular incident.  That is, unfortunately or fortunately,

16   however you look at it, not universally true of law

17   enforcement agencies across the country.

18     Q.      Do you know if any of the officers involved in

19   this case took a test--written test in regard to that

20   in-service training, whether or not they passed it?

21     A.      I don't recall seeing a test.

22     Q.      Okay.  Did the Tennessee POST standards require a

23   test to be given after in-service training?

24     A.      I don't recall.

25     Q.      Have you reviewed the Tennessee POST standards?

1      A.      I have seen the Tennessee POST standards, yes.

2      Q.      Have you reviewed them?

3      A.      Well, I didn't look at them in detail for this

4   particular case.  I have--I have previously looked at

5   Tennessee POST materials for other purposes.

6      Q.      Are you familiar with the Tennessee POST

7   standards?

8      A.      I'm not familiar with what changes they may have

9   had in the last few years.

10     Q.      Is that something that would be important for you

11   to be familiar with in expressing opinions in this case?

12     A.      Not necessarily, particularly if it's an area

13   where the department is providing training that may well

14   exceed that training that is typically offered nationally.

15     Q.      Number 6:  "As the investigation progressed and

16   officers learned that Woodward was falsely claiming that his

17   mother had been kidnapped"--

18     A.      Are you--what page are you on?

19     Q.      Eight.

20     A.      I see where you're at.

21     Q.      Second sentence.  ". . . and officers learned

22   that Woodward was falsely claiming that his mother had been

23   kidnapped, the officers should have been increasingly

24   concerned that Woodward had, at least initially, a large knife

25   and the inherent threat to public safety posed by Woodward's

1    behavior."

2            At this point, shouldn't they have also been

3    increasingly concerned about his mental state?

4        A.    They certainly should have been increasingly

5    concerned about what he might have intended to do with the

6    knife.  Keeping Woodward, his mother, the public, and the

7    officers safe should have been the primary focus at this

8    particular point.  But I would agree with--with you that they

9    should also be thinking about what his mental state is at this

10    point.

11        Q.    And part of--isn't part of keeping him safe

12    calling for medical assistance at this point, knowing what

13    they know?

14        A.    No.

15        Q.    Why not?

16        A.    At this point, nobody's seeing any signs that

17    he's in a medical crisis.  We--at this point, it is likely

18    that he's going to end up in the detention facility, where

19    he'll be assessed for his medical and mental health needs, but

20    he's not demonstrating signs of a need for acute intervention

21    at this point.

22        Q.    Now, you've told me that a couple of times, but I

23    can't get you to define medical crisis for me.

24        A.    And I can't.  I can--I can tell you what it--if

25    you give me a situation, I can tell you whether I would deem

1    it a medical crisis or not.  But there's such a wide array of

2    what may be a medical crisis for one person isn't a medical

3    crisis for another.

4          Q.     Okay.  Well, how does a police officer make that

5    decision?

6          A.     Largely based on the officer's common sense with

7    whatever symptoms or signs are evident to the officer.

8          Q.     Is common sense more important than his training?

9          A.     It could be.  It could be.

10         Q.     Let's go to page 10.  Number 3 says, "Police

11   officers are trained to take personal responsibility for their

12   safety and to take steps to detect contraband that might be

13   stashed in a police car during transport . . . ."

14                Isn't that something Ford should have done before

15   ever putting him in the police car?

16         A.     It certainly would have been reasonable for Ford

17   to do that.

18         Q.     I'm trying to skip some of this or we'll be here

19   all day.

20         A.     Other than the irritating noise of the airplane,

21   I don't mind.  And I don't want you to miss Las Vegas.

22         Q.     Let's go to page 13.  Paragraph 7.  "Plaintiff's

23   expert's claim [sic] that the Taser X26 delivers 50,000 volts

24   to the subject's body are false."  How many volts does it

25   deliver?

1    A.    It depends, but typically, you're only looking at

2    1,200 volts.  The fifty--the 50,000-volt number is a--it's a

3    media myth, if you will.

4    Q.    Is it a media myth or is that myth put out there

5    by Taser International?

6    MR. McMILLAN:  Objection.  I mean, you can answer

7    if you know, but he's not here to testify to what Taser

8    International does.

9    THE WITNESS:  I--I think it would be fair to say

10   that there have been people who have used that number not

11   cautiously that might be--might have been or may still be

12   associated with Taser International, but I don't know that

13   they were--I don't know that they were speaking for the--I

14   don't know, sir.

15   BY MR. BEDNARZ:

16   Q.    Didn't the early--

17   A.    But I get where you're coming from, okay?  I see

18   it.

19   Q.    Didn't the early promotional material that they

20   put out throw the 50,000 volt number out there for everybody

21   to see?

22   A.    I've seen some material, I'm sure, that folks at

23   Taser are uncomfortable with today.

24   Q.    Have you been to that place in the desert,

25   Scottsdale?

1    A.    Yeah, I've never--I've never taken the tour.

2    I've been to the outside of the building.

3    Q.    Oh, you haven't been in it?

4    A.    No.

5    Q.    Haven't had their scanners--

6    A.    I've heard.

7    Q.    You go into this room--

8    A.    Have you been there?  Have you gone to the class

9    there?

10    Q.    No, I took depositions there.  You go in the

11    front door, and you go in this round room and no windows.  And

12    there's a monitor and a retinal scanner.  And--

13    A.    So much of that is show.  I've heard that, sir,

14    but I don't--yeah, I've never--never been invited.

15    Q.    And it's all for show.

16          It looks to me like you don't think much of the

17    Canadian studies?

18    A.    There are some very fine products put out by

19    folks at the Ontario Police College and other--other Canadian

20    research facilities, but there are some--I'll just leave it at

21    that.

22    Q.    How about the Braidwood Commission?

23    A.    I'm not prepared to opine here today about the

24    deficiencies of the Braidwood Commission's report.

25    Q.    Paragraph 8, you say, "Officers are taught that

1  there have been well over 2,860,000 Taser applications on

2  humans."  Where do you get that information?

3       A.     That's a number that I include--and that's the

4  number in my current training material that I present.  And

5  that is a number--and I believe that number is actually--

6  what's the date of this?--I believe that number has actually

7  increased.  But at the time . . .

8            MR. McMILLAN:  I'm sure it's increased since we

9  started this deposition.

10            THE WITNESS:  At the time, that number was put

11  out by--oh, this is July--yeah.  I haven't updated my training

12  material since July 24th, but that number is available from

13  Taser International.

14       BY MR. BEDNARZ:

15       Q.     What does that number include?

16       A.     That includes field deployments, military and

17  civilian testing deployments, training deployments, as well as

18  Taser's own research deployments.

19       Q.     Do you know how many of those are the full

20  five-second application?

21       A.     I believe that the majority, but I do not know

22  whether that's--it's accurate to say that they're all a full

23  five-second.

24       Q.     Do you know that a very high percentage of them

25  was 0.5 seconds?

1    A.    No, I'm aware that during some of the research

2    trials, there were abbreviated deployments, but I don't

3    believe that it would be accurate to say that the vast

4    majority were.

5    Q.    The last sentence:  "However, officers are also

6    taught that there has never been a death that has been

7    scientifically or medically demonstrated to have been caused

8    by the application of the Taser device."  That one you're

9    going to have to explain for me.

10    A.    That's part of the training material.  It's part

11    of the training material Taser puts out.  It's consistent with

12    the medical research with which I am familiar, the medical

13    research that is commonly cited, the findings of medical

14    researchers that I've heard report at places--for, example,

15    the conference you mentioned you attended, the IPICD

16    conference.  There have been persons who have had a Taser

17    applied or deployed who subsequently died, that in no case has

18    there been conclusive scientific or medical evidence that the

19    Taser device caused, was the cause of that person's death.

20    Q.    And that's what I don't understand.  How can you

21    possibly say that--how--what would you have to do to

22    scientifically demonstrate or medically demonstrate that a

23    death had been caused by the Taser?

24    A.    You have to have an autopsy performed by a

25    medical examiner or someone who was scientifically or

1    medically qualified to reach that conclusion.

2         Q.    And if the medical examiner concluded that

3    somebody had ventricular fibrillation and died as a result of

4    the Taser application, would that be enough?

5         A.    I'm not--I'm not sure that that would be enough.

6    I could tell you that I'm not aware that there have been any

7    medical findings that have withstood review that have reached

8    that conclusion.  That's what I've been taught and that's my

9    belief.

10        Q.    You know there's some juries out there that have

11   reached that conclusion, don't you?

12        A.    I'm aware that there are some court cases where

13   nonmedical findings have disagreed with some of what I've

14   written here with respect to that.

15        Q.    You know medical examiners have made that

16   finding?

17        A.    I know that there have been--there has been at

18   least one autopsy challenged where that finding was at least a

19   preliminary finding.

20        Q.    Are you talking about the three that Taser filed

21   a lawsuit over in Ohio?

22        A.    Yes, sir.

23        Q.    What about in the Cardall case?  What did the

24   medical examiner find there?  Do you know?

25        A.    I have seen the medical examiner's report and the

1  expert--the medical experts' reports in that case, but as I

2  sit here today, I'm not prepared to tell you what I recall

3  from that.

4      Q.    Medical examiner's cause of death was ventricular

5  fibrillation as a result of the Taser application, wasn't it?

6      A.    I don't--as I sit here today, I don't recall.  I

7  remember some of the issues with respect to the medical

8  examiner, but I don't recall the specific findings of the

9  medical examiner.

10     Q.    Is the case still ongoing?

11     A.    It is.

12     Q.    Allegations that in that case the officers didn't

13 have any mental health training or adequate mental health

14 training?

15     A.    I don't recall what the complaint consists of in

16 that case.

17     Q.    How much are you involved today in training

18 officers to use Tasers?

19     A.    I continue to instruct Taser courses, and I

20 continue to--you know, for example, next week, I'll be

21 instructing at the Utah Sheriffs Conference on Taser risk

22 management issues, and then instructing for a police

23 department here.  I do it on a regular basis.  I do not--I'm

24 not sure if I understood your question.  I don't do it on

25 behalf of Taser and I don't work for Taser, if that's what you

1   were--what you're asking.

2        Q.      No, I was not.

3        A.      Okay.

4        Q.      How involved are you nowadays in terms of

5   developing policies for police officers and police departments

6   in regard to the use of Tasers?

7        A.      I am very involved in developing, maintaining,

8   updating, and making sure that policies are consistent with

9   current best practices in the realm of electronic control

10  devices through my work with Lexipol.  However, it would be

11  important to note that Lexipol does not promulgate a Taser

12  policy per se.  Lexipol promulgates a policy that addresses

13  electronic control devices.  It just so happens that Taser is

14  the leading provider of electronic control devices, I think in

15  the world, but certainly in the United States.

16       Q.      Would you agree that if you're going to teach

17  officers about Tasers, you have an obligation to teach them

18  about the dangers associated with using a Taser?

19       A.      I think that if there are known dangers that

20  officers should be taught about those--taught what those risks

21  are.

22       Q.      And if there's scientific evidence and medical

23  examiners medically demonstrating that people are dying, isn't

24  it irresponsible to teach them that a death has never been

25  scientifically or medically demonstrated to have been caused

1   by the application of a Taser?

2        A.      I think officers should be presented with the

3   best and most competent science where there are conclusive

4   findings available.

5        Q.      Okay.  And you cite Dr. Bozeman's report in here

6   where they--it's 1,200 some-odd cases they looked at?

7        A.      It's--if you say 1,200, that sounds--that

8   sounds--I think so.  I don't remember.  I probably--

9        Q.      1,201.

10       A.      What page are you on?

11       Q.      I'm looking at the article.

12       A.      Oh, yeah.  I don't--I thought--if you say 1,201,

13   that--I certainly don't disagree with you here today.

14       Q.      Do you know that even in this study, two people

15   died after being Tased?

16       A.      I'm aware that a person--again, if you--I haven't

17   read the Bozeman study in a while.  If you say two, I have no

18   reason, as I sit here, to disagree with you.

19       Q.      Are you familiar with the recent article by Dr.

20   Zipes in the Journal of the American Heart Association?

21       A.      Familiar with in the sense that I have the

22   download on my home computer, but not had--only read the

23   caption.  Haven't read--or not the caption; the abstract.

24       Q.      Dr. Zipes says that Tasers can cause death,

25   correct?

1    A.    I have no reason to disagree with you that that's

2    what the article says.

3    Q.    Wouldn't it make sense to start teaching these

4    police officers that this is a good tool to use, but it's

5    dangerous and you can kill somebody and not--don't use it as a

6    substitute for putting your hands on them?

7    A.    I don't agree with that broad statement.

8    MR. BEDNARZ:  I've got to take a short break

9    again.

10    (Recess taken, 11:51-11:52 a.m.)

11    BY MR. BEDNARZ:

12    Q.    You used the term, "a reasonable and well-trained

13    officer," frequently in your report.  And that's what we're

14    talking about here, right, what a reasonable and well- trained

15    officer ought to do?

16    A.    Yes.

17    Q.    Shouldn't a reasonable and well-trained officer

18    request paramedics or some kind of unit to respond as soon as

19    they know they're dealing with somebody under the influence of

20    drugs and exhibiting delusional behavior?

21    A.    No.

22    Q.    Why not?

23    A.    There are many people--police officers deal very,

24    very frequently with people under the influence of drugs.  I

25    mean, I don't know that this is the foremost reason, but one

1    practical reason is we simply don't have the emergency medical

2    resources in--in this country and certainly not in any city

3    I'm familiar with, to respond to every situation where police

4    officers deal with a person under the influence of drugs.  And

5    I'm going to include alcohol in that category because

6    certainly people die from alcohol poisoning as well.

7           But the fact of the matter is, a lot of people

8    that are exhibiting signs of a mental health situation and are

9    under the influence of drugs don't need emergency medical

10   treatment.  They don't need paramedics.  Their situation can

11   be addressed adequately by taking them to a detention center.

12   For example, at 2:00 in the morning last night when I got

13   home, one of the--one of the best places in the valley,

14   outside of a hospital emergency room, to get emergency medical

15   treatment would have been at the receiving center of the Salt

16   Lake County Jail where they've got trauma nurses sitting

17   physically there.  They're prepared, trained, equipped, and

18   highly experienced in addressing people in mental health

19   crises who are under the influence of drugs.

20        Q.    Now, PERF, the Police Executive Research Forum,

21   what is that?

22        A.    It's pretty much exactly what it sounds like.

23   PERF is an organization that promulgates--first off, they

24   sponsor research.  Secondly, they bring together subject

25   matter experts to examine research in what you might call a

1   literature review and to discuss best practices for police in

2   a variety of areas.

3          Q.      And do you know what--well, scratch that.

4          Are you familiar with PERF guidelines for using

5   conducted energy devices?

6          A.      I am--I have reviewed them and am familiar with

7   the fact that their guidelines were, how should we say,

8   modified, adjusted, re--revised is the best word--last year.

9          Q.      In what way were they revised?

10          A.      I couldn't tell you.  There was a fairly lengthy

11  list and report and I worked with some other folks in dividing

12  up that report and looking at particular segments and as I sit

13  here today, I don't--I can't honestly recall which segments

14  and which parts I was detailed to look at.

15          Q.      Do you have any criticisms of the guidelines put

16  out by PERF?

17          A.      I have previously participated in discussions

18  where I was critical.  I'm not--it's not anything I reviewed

19  in the recent past and it's not the sort of thing I would be

20  able to tell you here today with respect to specific

21  criticisms.

22          Q.      Okay.  How about the model policies from the

23  International Association of Chiefs of Police in regard to

24  Tasers or ECDs?

25          A.      Which are fairly--you see some of the same people

1   involved in that group as you see in PERF.  And again, in the

2   course of working on ECD policies for other agencies, I have

3   looked at the IACP policies.  I'd be happy to address

4   particular elements of those policies, but I can't tell you,

5   off the top of my head, what I might or might not disagree or

6   agree with.

7       Q.     CEDs should only be used against persons who are

8   actively resisting or exhibiting active aggression.  Do you

9   agree with that?

10      A.     As a general proposition, yes.  One of the

11  difficulties there is today as we speak, even last week I've

12  been involved in a couple of discussions about trying to

13  define what is active resistance.  And that, in fact, is one

14  of the criticisms that some people have raised about some of

15  the PERF writing is they've used terms that to--to some of

16  their folks may have universal application, but may not

17  necessarily have universal application in a broader audience.

18      Q.     Training protocols should emphasize that multiple

19  activations and continued cycling of a CED appeared to

20  increase the risk of death or serious injury and should be

21  avoided where practical.  Do you agree with that?

22      A.     I agree that multiple applications and cross-

23  applications and multiple cycling are--have been shown to

24  require further study.  And in fact, there is some indication

25  that multiple applications, cross-applications and multiple

1  cycling do, in fact, increase risk to the person against whom

2  the device is being deployed.  And I believe that that--I have

3  personally incorporated that into policies I've written.  I've

4  also personally incorporated that into training materials that

5  I use and that is, in fact, something I'll be discussing next

6  week as I present a couple of times on ECD use.

7       Q.     Problems with this computer.

8       A.     Yeah, well, if it were me, I'd have problems with

9  any computer, so . . .

10      Q.     Okay.  Back to IACP, would you agree that the

11 ECW's generally analogous to pepper spray on a force

12 continuum?

13      A.     I would agree that there are circumstances where

14 deployment of pepper spray or similar chemical weapons would

15 be analogous to circumstances where it would be appropriate to

16 deploy a conducted energy weapon.

17      Q.     Do you agree they ought to be used pretty much in

18 the similar--in similar circumstance?

19      A.     I do not.

20      Q.     Do you think a Taser should be used in cases

21 where pepper spray would not be appropriate?

22      A.     There may be cases where pepper spray is

23 appropriate and a Taser is not.  There may be cases where a

24 Taser is appropriate and pepper spray is not.

25      Q.     The general orders of the Gallatin Police

1    Department, do you know where they put those two in the force

2    continuum?

3         A.    I--I have read that, but I don't remember where

4    they're at.

5         Q.    It says it is forbidden to use the device, ECW,

6    as follows:  on a handcuffed or secured prisoner, absent

7    overtly assaultive behavior that cannot be reasonably dealt

8    with in any other less intrusive fashion.  Do you agree with

9    that statement?

10        A.    I believe that's written a little more

11   restrictive than--restrictively than I would write the policy,

12   but I generally agree with that preposition--that proposition.

13        Q.    This device may also be used in certain

14   circumstances in a touch stun mode.  This involves removing

15   the cartridge and pressing the unit against an appropriate

16   area of the body based on training.  It is important to note

17   that when the device is used in this manner, it is primarily a

18   pain compliance tool due to the lack of probe spread.  Do you

19   agree with that?

20        A.    That's an accurate statement.

21        Q.    That it's minimally effective compared to

22   conventional cartridge-type deployments.  Do you agree with

23   that?

24        A.    I agree with that in the context that cartridge-

25   type deployments refer to probe deployment.

1    Q.    And that the touch stun mode should be subject to

2  the same deployment guidelines and restrictions as those in

3  the ECW and cartridge deployments.  Do you agree with that?

4    A.    As a general proposition, yes.

5    Q.    Are you familiar with the IACP's electronic

6  control weapons concepts and issue papers?

7    A.    I have read it.

8    Q.    And it was designed to accompany the model

9  policy?

10   A.    I think it was part and parcel, but I agree that

11  it's associated with their--with their model policy.

12   Q.    Would you agree the comprehensive research on the

13  uses of ECWs and their potential role in injury or death is

14  not yet available?

15   A.    I would not.  There is a substantial body of

16  research that has been completed and my--my impression is that

17  there's probably not a tool in the arsenal of law enforcement

18  that has been more studied, including firearms, than

19  electronic control devices.

20         Now, are there improvements to be made in

21  research and ongoing research?  Certainly.

22   Q.    Do you agree that use of the ECW as a contact

23  weapon operates as a device rather than an electromuscular

24  disrupter and as such, may not be effective on persons who,

25  because of drug or alcohol use, or mental illness, do not

1   sense pain as readily as others?

2       A.      I think that's an accurate statement.

3       Q.      Do you agree that officers must consider the

4   totality of the circumstances in every use of force situation

5   to ensure that the best overall decision is made?

6       A.      I agree that the officers should consider the

7   totality of the circumstances that they can perceive and

8   information available to them.

9       Q.      And that they should be aware of the following

10  concerns:  Is there a need to immediately incapacitate the

11  subject?  Does the subject appear mentally deranged, under

12  severe influence of drugs or alcohol or in a highly agitated

13  and uncontrolled state?

14      A.      I think those are factors an officer should

15  consider.

16      Q.      If an ECW is not held vertical to the ground,

17  turn it sideways, are you as accurate when you shoot it?

18      A.      As a general proposition, no.  And I--I think--

19  I'm answering your question with respect to a Taser.  There

20  are other ECWs out there, some of which I have seen

21  demonstrated and some of which I've used in training.  Some of

22  which I'm not familiar with and I've only seen pictures of and

23  videos and read--read material on--literature on.

24      Q.      Do you teach officers to keep the gun--forget

25  what I said--

1     A.      Vertical.

2     Q.      --vertical to the ground?

3     A.      If, by vertical to the ground, you're referring

4   to the grip being parallel to the officer's body straight up

5   and down, the officer's standing, then yes.  I think that's

6   what you meant by vertical.

7     Q.      And because of that--that's because the probe

8   spread--one of the probes comes out at an angle, is that the

9   main purpose of that?

10    A.      Yes.  The probes are designed to be fired on

11  angles.

12    Q.      Okay.  Do you agree that limiting the number of

13  injuries--limiting the number of energy cycles, the use of

14  continuous cycling of more than 15 seconds, and instances of

15  multiple officer deployments against the same person can help

16  prevent tetany, which is muscular spasms, or exhaustion of

17  muscles of respiration and the development of acidosis?

18    A.      I have read research that indicates that.  I

19  don't--I don't know that that's a sound medical conclusion,

20  but I have read material that lead me to believe that.

21    Q.      Okay.  And you know that's a recommendation by

22  the International--

23    A.      IACP, yes.

24    Q.      --Association . . .

25            Do you agree that police may be misled by the

1   fact that the subject can still speak, indicating the clean--a

2   clear airway, which does not necessarily mean they can breathe

3   at an adequate rate?

4        A.      I do.

5        Q.      Persons experiencing severe cocaine,

6   methamphetamine, or other forms of serious drug or alcohol

7   intoxication are among those at highest risk of sudden death.

8   Do you agree with that?

9        A.      Yes.  When you say among, that not being an

10  exhaustive list, yes, I agree with that.

11       Q.      And it goes on to say it is not difficult to

12  postulate that the use of an ECW on such individuals, who are

13  often already in a precarious physical state, could

14  precipitate unexpected negative--negative consequences,

15  including death?

16       A.      And I don't know that the medical science

17  necessarily is consistent and harmonious on that point, but I

18  am aware of researchers that have made that assertion.

19       Q.      And this is the IACP who's saying this?

20       A.      Well, it--it--it's a--I think that you're

21  actually reading--I don't know where you're reading from, but

22  I think that's discussed in the issues paper.  And the issues

23  paper is based on medical research as well as practitioner

24  opinions interpreting that medical research.  I simply don't

25  know that that's--that that's been determined to a reasonable

1  degree of scientific certainty.

2      Q.      This is information--

3      A.      But I know that it says that, if that's what

4  you're asking.  I've read that.

5      Q.      It's information put out by IACP and provided to

6  police departments across the country?

7      A.      It's available, yes.

8      Q.      Failure to provide professional accepted training

9  exposes the officer, the agency, and the public to an

10  increased potential for negative outcomes.  Do you agree with

11  that?

12      A.      Yes.

13      Q.      It is important to note that some ECWs project a

14  visible red laser dot on the target and that the cartridge can

15  be quickly removed from the device and a visible electric arc

16  displayed in an effort to coerce suspect compliance.  Use of

17  these types of preemptive measures have been the subject of

18  much debate.  In a number of cases, these actions have

19  convinced suspects that they should submit to officer

20  directions rather than resist.  However, in other cases,

21  suspects immediately attacked officers or turned and ran away,

22  requiring a foot pursuit and physical confrontation after

23  being overtaken.  Considering the totality of the

24  circumstances, it is generally better to use the device as

25  soon as practical after justification is established.

1            Do you agree with that?

2      A.    I agree that--what you read says that it has been

3  the subject of much debate.  I would agree with that, but I

4  would say that it continues to be the subject of very active

5  and vigorous debate in the law enforcement community.

6      Q.    And it acknowledges the fact that some of these

7  people, when they see this red light on them, they're going to

8  take off and run?

9      A.    Yes.

10      Q.    So if you're going--you don't want to keep

11  warning them over and over and over again, you're going to do

12  this; is that correct?

13      A.    That's where the--that's one of the key points of

14  this discussion, this ongoing discussion.

15      Q.    And then it lists situations where the suspect

16  needs medical attention.  I'm not going to go through those.

17            I'm going to go real quickly through the model

18  policy for K9s.  Are you familiar with that one?

19      A.    I am.  And when you say real quickly, how quickly

20  do you mean?

21      Q.    Pretty quickly.

22      A.    Okay.

23      Q.    Need a break?

24      A.    I'm getting close--close to the end of my water

25  tolerance.

1          Q.      We can take a break.

2          A.      If you don't mind.

3                  (Recess taken, 12:14-12:21 p.m.)

4      BY MR. BEDNARZ:

5          Q.      All right.  I want to go to page 27 of your

6      report.

7          A.      Thanks for that break.

8          Q.      I'm trying to get through this so we can--I

9      didn't mean to take this long, but--"The system of review,"

10     No. 3--

11         A.      Okay.

12         Q.      --"for police use of force is enhanced by

13     separate early warning system designed to identify potential

14     concerns through a pattern of citizen complaints."

15                 Tell me about the system of review they've got.

16     Are you familiar with it?

17         A.      They use a commercially available software

18     program.  I've seen advertisements.  I'm not familiar with

19     this particular software program, but I am generally familiar

20     with how they work.

21         Q.      Do you know the name of it?

22         A.      I saw it, but I don't remember what it is.

23         Q.      Based solely upon citizen complaints?

24         A.      No.  It--one of the other things that is examined

25     is the overall ratio of uses of force to arrests, and then if

1   there are individual officers who--I don't want to say score,

2   but have a higher number that is markedly inconsistent with

3   other officers' uses of force per arrest. Excuse me, not per

4   arrest, but per numbers of arrest in a particular reporting

5   period.

6          Q.      And then you go on to talk about CALEA standards?

7          A.      Yes, sir.

8          Q.      And that requires the completion of a written

9   report whenever an officer uses a force tool or applies

10   weaponless physical force.  Gallatin belongs to CALEA?

11          A.      Yeah.  I'm not sure the right term is it belongs

12   to, but they have paid the fee and have had accreditors from

13   CALEA come in and review their agency and they achieved their

14   accreditation.  I don't remember when it was before this case.

15          Q.      And to maintain that accreditation, they've got

16   to meet the standards?

17          A.      Yes.  I don't--there's a periodic review.  I

18   don't remember what the period is.  It's yearly, thereabouts.

19          Q.      You talk about, "Nationally, among persons who

20   have had contact with police, an average of 1.5 percent had

21   force used or threatened against them . . . ."  When you say

22   persons who had contact with police, what does that mean?

23          A.      Persons who are in a situation where there is a

24   call for service or where police are proactively responding to

25   a situation, the--that statistic actually comes from OJP, the

1    Office of Justice Program.  And I can't recite for you their

2    definition here, but grossly, it's defined as persons who are

3    involved in a call for service or an on-view police

4    intervention.  It would not refer to, for example, you calling

5    the police asking what the helmet laws for motorcycles in the

6    state of Utah are.  And incidentally, we don't have any helmet

7    laws.

8        Q.    Does it strike you as odd that there's never

9    been--the City of Gallatin has never found that a police

10   officer used excessive force?

11       A.    I'm not sure that that's accurate, but it would

12   strike me as notable if that were the fact.

13       Q.    That would be highly unusual for a force that

14   size, wouldn't it?

15       A.    It might be.  My agency over which I am the chief

16   is approximately the same size.  My agency has actually even a

17   lower force ratio, according to NIJ--excuse me--the National

18   Institute of Justice standards.

19       Q.    Which agency are you talking about?

20       A.    The Utah attorney general investigation division,

21   the state-wide investigative agency in this state.

22       Q.    That would be a substantially different type of

23   law enforcement, wouldn't it?

24       A.    It would.  And that's my point.  I would expect

25   to see a different ratio, for example, in--I was just down in

1   Los Angeles last week, and the officers that I was riding with

2   down there, I think, would have a much different ratio than,

3   for example, my daughter's on her way to Sandpoint, Idaho.  It

4   just depends on a number of factors, sir.

5       Q.    And you say Gallatin's substantially lower.  But

6   to compare Gallatin to the other departments would require

7   them to report the uses of force in the exact same manner,

8   correct?

9       A.    It would.  And the--the Gallatin reports--this

10  is--this ratio here is based on something called NIBRS,

11  N-I-B-R-S.  And I don't remember exactly what that stands for,

12  but it's the department of justice's reporting system. But at

13  the end of the day, Mr. Bednarz, I would have to say that

14  there's still discretion in how Gallatin reports, how my

15  agency reports, how LAPD reports and how NYPD reports.

16      Q.    For instance, would you agree that every trigger

17  pull of a Taser is a separate use of force?

18      A.    If--other than training and other than testing,

19  yes.

20      Q.    Do you know, when they keep these statistics,

21  whether Gallatin would report four trigger pulls as one use of

22  force or four uses of force?

23      A.    If I saw that, I don't recall it.

24      Q.    Do you know if they do it the same way as, for

25  instance, Nashville does?

1    A.    I do not.

2    Q.    And that could have a significant effect on these

3    final numbers when you start trying to make comparisons like

4    that, wouldn't it?

5    A.    You bet.  Any--any discretionary exercise or even

6    any nondiscretionary, inconsistent exercise of discretion in

7    reporting could impact these numbers.

8    Q.    And if there was a higher rate of officers in a

9    particular department using force and not reporting that

10   force, that could have a significant effect on the numbers,

11   couldn't it?

12   A.    Oh, yes.  Yeah.

13   Q.    We might have suspects who are politer in

14   Tennessee, so it doesn't require the use of force?

15            MR. McMILLAN:  Objection.

16            THE WITNESS:  Having--having worked in the great

17   state of Texas and having lived in the South in the early part

18   of my days, I will say that that certainly is within the realm

19   of possibility.  And on those rare occasions that I've been to

20   Tennessee, I have found that Southern hospitality is not a

21   myth.

22            MR. BEDNARZ:  And off the record.

23            (A discussion was held off the record.)

24   BY MR. BEDNARZ:

25   Q.    I want to show you this video for just a minute.

1    A.    Would you like me to come over there--

2    Q.    Yeah.

3    A.    --or just turn around?  What do you want to do?

4    Q.    Might see it better if I turn it away from the

5    window.

6    A.    Do you want to sit here, sir, and I'll--

7    Q.    It doesn't matter.  I'll just put it over here so

8    everybody can see it.

9         MR. McMILLAN:  Can you see it okay with the

10    lights on?  Do you want to dim it a little bit?

11         THE WITNESS:  I can see the screen just fine.  I

12    just didn't want to look over your shoulder because . . .

13         MR. McMILLAN:  Maybe I can do half of them.  Do

14    you know which part of the video you want to play?

15         MR. BEDNARZ:  Yeah, this is it, I think.

16         Start over.

17         Well, this program, I can't . . .

18         Okay.  I'll go to 1647.

19         Okay.

20         THE WITNESS:  Should I look now?

21    BY MR. BEDNARZ:

22    Q.    Okay.  If you'll look over here in just a minute,

23    do you see him go down?

24    A.    Yes, sir.

25         MR. McMILLAN:  For the record, whose video camera

1    is this?

2              MR. BEDNARZ:  This is the Hill video.  We're at

3    1647.

4              MR. McMILLAN:  Okay.

5        BY MR. BEDNARZ:

6        Q.     I want you to count from the time he falls until

7    the time he--

8        A.     Did you put it back?

9        Q.     Yeah.  Could you tell whether or not that

10   five-second cycle ran?  Did it appear he was partially

11   incapacitated for five seconds?

12       A.     To me, it does not.

13       Q.     Okay.

14       A.     Do you have--is there a time counter on there,

15   sir?

16       Q.     Yeah.

17       A.     Can I look at that or would that be . . .

18       Q.     Okay.  We're about 15 seconds before that, but

19   there's a time counter down here.  I guess if you'll tell me

20   when you think--you tell me what you think.

21       A.     I--and I was paying attention to him, so I didn't

22   really look at the time there, but.

23       Q.     Could you tell if he was on the ground for five

24   seconds?

25       A.     It--it seemed to me, just looking at it, that it

1   was close to five seconds.

2       Q.      Right there, do you see the Taser wires still

3   hanging on him?

4       A.      I see one wire, yes, sir.

5       Q.      And he's on the car.  Well, it's not working like

6   I wanted it to, so we'll move on.

7       A.      A better copy--better screen--

8       Q.      It worked, it's much easier to--

9       A.      Sure.

10      Q.      Do you know Chief Burke at Salt Lake City?  Is he

11  still a chief or is that wrong?

12      A.      That's--that's not correct.

13      Q.      Do you know a Chief Burke?

14      A.      I--I don't.  Their second tier of command there

15  is also called Burke, but I don't believe there's anyone there

16  by that name.

17              Burke in Phoenix.

18      Q.      I think I'm probably through, but why don't we

19  take about a three-minute break so you guys don't have to sit

20  here while I go through this stuff.

21      A.      Okay.

22              (Recess taken, 12:38-12:43 p.m.)

23  BY MR. BEDNARZ:

24      Q.      I bet you wish I said I didn't have any more

25  questions.

1      A.     I don't care.  I don't have many.

2      Q.     Do you know Michael Brave?

3      A.     Yes.

4      Q.     And how do you know Mr. Brave?

5      A.     I know him both--well, we--we see each other and

6   communicate with each other on a fairly regular basis.

7      Q.     Is it through the--

8      A.     We have sat together on committees.  We have

9   co-presented.  He has attended presentations that I have done.

10  I have attended presentations that he has done.

11     Q.     Institute for the Prevention of In-Custody

12  Deaths--trying to get that out--but through that organization,

13  do you know him?

14     A.     That is one of the venues at which he has

15  attended something I have presented.  And I believe I've heard

16  him present there, but I'm not certain.

17     Q.     Okay.  Do you know him through the department of

18  justice?

19     A.     We did not serve together on a department of

20  justice committee.

21     Q.     How long have you known Mr. Brave?

22     A.     Oh, gosh, 12 to 15 years.

23     Q.     Okay.

24     A.     I've personally known, 12 to 15 years.  No, even

25  before that.

1    Q.      Okay.  How did you meet him?

2    A.      When I was a bureau chief at the Utah Department

3    of Public Safety, one of the projects that I oversaw was a

4    revamping of our police academy curriculum.  And we added to

5    the curriculum a couple of courses that I personally directed

6    the curriculum development.  And in one of those courses, I--I

7    talked to a number of subject matter experts and asked to sit

8    down with them and discuss.  I--I'm a little fuzzy, but I

9    believe that was my first exposure to personally dealing with

10   Mike Brave.

11   Q.      Have you taken any advanced training courses from

12   Taser, the Armorer course or any of that advanced-type stuff?

13   A.      I have taken the instructor recertification

14   course and I'm currently--well, no, not from Taser.

15   Q.      Then I've got ask from who, since you started to

16   go there.

17   A.      Yeah.  I figured you would.  IPICD, the Institute

18   for Prevention of In-Custody Death, presents a course that I

19   think it's like a co-share, like a sanctioned course by Taser,

20   but it's not at Taser's facility.

21   Q.      Okay.  And what is the name of that course?

22   A.      It's the forensic ECD course.

23   Q.      Now, throughout your report, you make mentions of

24   Mr. Woodward trying to escape.  When you used the term escape,

25   do you really believe he was trying to escape from the police

1  officers?

2      A.      Get away from the police officers.

3      Q.      You don't believe he could have gone anywhere, do

4  you?

5      A.      Boy, I--I don't know that.

6      Q.      Is it typical for somebody to be trying to get

7  away from the causes of pain rather than from the police

8  officers themselves?

9          MR. McMILLAN:  Object.

10         THE WITNESS:  It depends on the personal

11  circumstances.

12     BY MR. BEDNARZ:

13     Q.      Have you reviewed anything that's not listed on

14  your report?

15     A.      If you want to refine that question, have I

16  reviewed anything that I've relied on in my report that's

17  specifically for writing this report or testifying here today,

18  the answer is no.

19     Q.      Have you reviewed anything related to this case

20  that's not listed in your report?

21     A.      Well, I mean, I've read research studies that you

22  haven't cited here today that generally deal with electronic

23  control devices.  I've read other books, but not in the

24  context of preparing for this case, and certainly not in the

25  context of preparing for here today.

1    Q.      For instance, you've got a number of depositions

2    listed on this report.  Have you read all of those

3    depositions?

4    A.      If I've got them listed here--and I think there

5    were like eight, nine--well, let me just look at names, okay?

6    Q.      Okay.

7    A.      I have read all of those depositions.  If there

8    are others, I either haven't read them or I don't know that

9    they exist.

10   Q.      Have you been provided with summaries of those

11   depositions?

12   A.      No.

13   Q.      Have you made summaries of those depositions?

14   A.      No.

15   Q.      Have you taken any notes?

16   A.      No.

17           Well, let me--let me tell you how I do my report,

18   and that might cut--I'm not sure if you want to pursue that

19   any more, but I--I typically start the report--it starts with

20   about three pages, the caption, and the next thing I do is as

21   I--this is not perfect order, but it's generally a rough order

22   of the order in which I read things, so I'll go through those

23   and I'll form an outline in my head.  That outline then

24   becomes what is primarily--it ends up in bold. That's kind of

25   how I work.  And so when you say notes, I mean, yeah, I wrote

1   stuff and changed stuff as I went along, but I don't take

2   notes and I don't underline depositions and so forth.  Insofar

3   as possible, sir, I try and review them on a computer screen

4   and not on a piece of paper.

5       Q.    Have you read every page of everything that was

6   given to you?

7       A.    Oh, my gosh, I think so.  There might have been a

8   page or two.  And I can't remember which one it was.  And I'm

9   sure you had nothing to do with it, but there might have been

10  a page or two that I read it and my head went like that

11  (Indicating).  Mrs. Rutter's deposition, for example, got

12  long.

13      Q.    I did not take that, so . . .

14            MR. McMILLAN:  My apologies.

15            THE WITNESS:  Oh.  Sorry.  That's right.  Sorry.

16  BY MR. BEDNARZ:

17      Q.    Did--I've forgotten my next question.

18            Have you been provided with any of the reports of

19  the other experts hired by the defendant?

20      A.    I'm not--I have a general sense that there are

21  other experts.  I don't know who they are, and no, I have not

22  seen the reports.

23      Q.    Okay.  Do you know Robert Allen from Nashville?

24      A.    I know--I think I know who a Robert Allen is, but

25  I don't know him.

1          MR. BEDNARZ:  I'm through.

2          THE WITNESS:  Okay.

3          MR. McMILLAN:  I'm not going to ask him many

4     questions, but I have one follow-up about . . .

5          MR. BEDNARZ:  Wait a minute.  Are you or aren't

6     you?

7          MR. McMILLAN:  I'll ask a couple.

8          MR. BEDNARZ:  Okay.

9          THE WITNESS:  He said one.  One means--

10         MR. BEDNARZ:  I thought he said first, I'm not

11    going to ask him any questions.

12         MR. McMILLAN:  I said I'm not going to ask him

13    many, because then you'll ask more and we'll all be hungry.

14    EXAMINATION

15    BY-MR.McMILLAN:

16    Q.     You discussed with Mr. Bednarz page 28, paragraph

17    6, of your report, and the two of you discussed that the fact

18    that nationally, among persons who had contact with police, an

19    average of 1.5 percent had force used or threatened against

20    them during their most recent contact. Discussion ensued.  Mr.

21    Bednarz pointed out, through his questioning of you, that it

22    depends on how the force is reported and in particular, he

23    discussed with you that if each trigger pull of a Taser is not

24    counted as a separate use of force, that could skew those

25    numbers, and I think you agreed with him.  But I'll ask you to

1    reconsider that. Would that--if just considering the number of

2    trigger pulls as a use of force, if that's not counted, would

3    that change actually the percentage of persons who have

4    contact with police in forces used against them?

5              MR. BEDNARZ:  Object to the form.

6              THE WITNESS:  No, it wouldn't.  I'd have to go

7    back and look at OJP's standards, but I don't--again, Mr.

8    Bednarz is correct.  There's a bunch of things you can do to

9    skew those numbers.  You can misreport, you can underreport.

10   You can exercise discretion in what you call force.

11        BY MR. McMILLAN:

12        Q.    Uh-huh (Affirmative).

13        A.      And there's a framework that helps report those.

14   And I don't believe that--it's my understanding that OJP

15   considers a Taser deployment as a Taser deployment and if

16   there are multiple applications, that's counted still as one

17   use of force.  But again, an agency--I give the example of New

18   York police and LAPD.  The reason I gave those two examples is

19   because there have been allegations in those two very large

20   departments of their skewing numbers reported to the bureau of

21   justice statistics at different points in their history.  You

22   can--you can mess with these, but what's--my point here in

23   this paragraph, I think may be lost in both of your questions.

24   And that is simply that the Gallatin Police Department has a

25   significantly lower rate. It's half.

1           MR. McMILLAN:  That's my--that's my question.

2   Thank you.

3           FURTHER EXAMINATION

4           BY-MR.BEDNARZ:

5           Q.      I did remember one, since--

6           MR. McMILLAN:  I knew it.

7           BY MR. BEDNARZ:

8           Q.      --since that question was asked.  In your report,

9   you mentioned that the departments you worked with or agencies

10  you've seen that injuries to both suspects and officers went

11  down after the introduction of Tasers?

12          A.      That is universally true, in the departments

13  either for whom I have consulted, written policy, or been

14  called on to look at their force reporting.  And I have heard

15  anecdotally through others that that's true in other agencies.

16          Q.      Okay.  Have you heard that there are certain

17  agencies where injuries to suspects and police officers have

18  actually gone up after adopting Tasers?

19          A.      I have not heard that there are agencies where

20  injuries have actually increased, no.

21          Q.      In the area that this lawsuit is filed, middle

22  Tennessee, do you know whether or not injuries have gone up or

23  down?

24          A.      I don't.

25          Q.      So you haven't heard that in Nashville when they

1   put Tasers on the street, that both injuries to suspects and

2   officers went up?

3        A.      That's not anything I've heard, no.

4                MR. BEDNARZ:  Okay.  That's all of my questions.

5                THE WITNESS:  Okay.  I prefer to read and sign,

6   if that's an option.

7                MR. BEDNARZ:  That's an option.

8                MR. McMILLAN:  You may.

9                     Exhibit-1 marked

10               (Proceedings concluded at 12:56 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        CERTIFICATE

2    STATE OF _____ )

3             : ss.

4    COUNTY OF _____)

5        I HEREBY CERTIFY that I have read the testimony

6    consisting of _____ pages, and the same is a true and

7    correct transcription of said testimony with the exception of

8    the corrections I have listed below in ink.

9    Page____ Line____ Correction_____

10   Page____ Line____ Correction_____

11   Page____ Line____ Correction_____

12   Page____ Line____ Correction_____

13   Page____ Line____ Correction_____

14   Page____ Line____ Correction_____

15   Page____ Line____ Correction_____

16   Page____ Line____ Correction_____

17   Page____ Line____ Correction_____

18   Page____ Line____ Correction_____

19                        _____

20                        KENNETH R. WALLENTINE

21   SUBSCRIBED AND SWORN to at _____, this _____

22   day of _____, _____.

23                        _____

24                        NOTARY PUBLIC

25   My Commission Expires: _____

```
 1                        CERTIFICATE

 2

 3   State of Utah        )

 4            ss.

 5   County of Salt Lake )

 6

 7            I hereby certify that the witness in the

 8   foregoing deposition was duly sworn to testify to the truth,

 9   the whole truth, and nothing but the truth in the

10   within-entitled cause;

11            That said deposition was taken at the time and

12   place herein named;

13            That the testimony of said witness was reported

14   by me in stenotype and thereafter transcribed into typewritten

15   form.

16            I further certify that I am not of kin or

17   otherwise associated with any of the parties of said cause of

18   action and that I am not interested in the event thereof.

19

20

21                         _____

22                         Scott M. Knight, RPR

23                         Utah License Number 110171-7801

24

25
```