IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ANDREA WOODWARD, ET AL.              )
                                     )
v.                                   )     No. 3:10-1060
                                     )     Magistrate Judge Bryant
CITY OF GALLATIN, TENNESSEE, ET AL.  )

# M E M O R A N D U M

This civil action is before the undersigned for all further district court

proceedings, including entry of final judgment, pursuant to the consent of all parties.

(Docket Entry No. 36)  Currently pending are defendant City of Gallatin's motions for

summary judgment (Docket Entry No. 73) and to exclude expert testimony of Ernest Burwell

(Docket Entry No. 79), to which plaintiffs have responded.  The City of Gallatin has further

moved to ascertain the status of these aforementioned motions.  (Docket Entry No. 93)

Finally, the City of Gallatin has filed eight motions in limine.  (Docket Entry Nos. 94-101)

For the reasons given below, and by contemporaneous Order, the motion to ascertain status

will be granted; the motion for summary judgment will be granted; plaintiffs' federal claims

will be dismissed with prejudice, while their state claims will be dismissed without prejudice

to refiling in state court; and the motion to exclude expert testimony and all motions in

limine will be denied as moot.


## I.  Statement of the Case

Plaintiffs originally sued in state court, seeking relief under 42 U.S.C. § 1983

for violations of the constitutional rights of plaintiffs' decedent, Mr. Jeffery Woodward, by defendants City of Gallatin, Tennessee, Gallatin Police Department, John Does 1-10, and TASER International, Inc. (Docket Entry No. 1-1) The case was removed to this Court, and plaintiffs' claims against TASER International, Inc., have since been dismissed by stipulation. (Docket Entry No. 29) Thereafter, the Court dismissed plaintiffs' claims against the John Doe defendants (Docket Entry No. 37), and against the individual Gallatin police officers which plaintiffs had attempted to bring into the litigation as comparative tortfeasors. (Docket Entry Nos. 63-64) Accordingly, the only remaining defendant is the City of Gallatin.[1]

Plaintiffs allege that on October 27, 2009, the decedent, Jeffery Woodward, died as a result of unnecessary, excessive force when subjected to multiple taser applications during the course of his arrest. They further allege, *inter alia*, that the City failed to develop and implement adequate policies to establish appropriate handling by its police officers of persons in the same or similar circumstances as Jeffery Woodward, i.e., mentally ill and/or drug addled suspects; that the City failed to adequately train its police officers on how to take suspects into custody during a taser application; and, that these failures resulted in the deprivation of Mr. Woodward's liberty interest in receiving prompt medical attention for his serious medical needs, and subsequently, the loss of his life. (Docket Entry No. 1-1 at 5-9)

## II.  Statement of Material Facts

Jeffery Woodward had a history of methamphetamine and cocaine abuse

---

[1]While plaintiffs also named the Gallatin Police Department as a defendant, that entity is not subject to suit under § 1983 apart from the City of Gallatin, but is merely a division or branch of the City government.  See Rivers v. Scott, 2012 WL 2367167, at *4 (M.D. Tenn. June 21, 2012).

causing him to have an enlarged heart, which placed him at an increased risk for sudden cardiac arrest and death. (Docket Entry No. 86, Statement of Undisputed Facts, at ¶ 2) On the night of his death, Mr. Woodward began acting strangely, telling his mother, Mrs. Rutter, that she was not his actual mother, that someone had planted her in the house, and that someone was holding his real mother hostage. Id. at ¶ 3. At approximately 10:00 p.m., Mr. Woodward called 9-1-1 and reported that his mother had been kidnapped and was being held hostage; he then left her house on foot. Id. at ¶ 4. After leaving, Mr. Woodward knocked on neighbors' doors looking for help for his mother. One of those neighbors called 9-1-1 in response to plaintiff's plea for help for his mother, and several Gallatin police officers were dispatched to the home on Trousdale Avenue in response to the emergency calls. (Docket Entry No. 77 at 4)

While en route to Trousdale Avenue, Officer Mark Hill, who was the City's K9 officer and had his police dog, Alex, with him, saw Mr. Woodward walking down Long Hollow Pike. Officer Hill stopped his car and made contact with Mr. Woodward, who was holding a knife. Mr. Woodward immediately discarded the knife at Officer Hill's command, and upon further interaction with Officer Hill, informed Officer Hill that his mother had been kidnapped and was being held hostage in her attic by a number of suspects. Id. While they spoke, Master Patrol Officer Kris Ford arrived on the roadside scene to assist Officer Hill. After conferring with Officer Hill, Officer Ford transported Mr. Woodward to Trousdale Avenue in the back of his patrol car. Mr. Woodward was not a criminal suspect at that time, and was not searched or handcuffed prior to transport in Officer Ford's car. Id.

In their roadside encounter with Mr. Woodward, before taking him to his mother's house, Officers Hill and Ford did not apply any force to him other than a verbal

3

command to drop the knife, with which he complied. He was also compliant in being transported in Officer Ford's car. (Docket Entry No. 86 at ¶ 5) When Officer Ford arrived at Mrs. Rutter's house on Trousdale Avenue, he left Mr. Woodward in the back seat of his patrol car, and went inside Mrs. Rutter's house. Mrs. Rutter told Officer Ford and Sergeant Chris Shockley that she was fine, that no one else was in the house, and that she believed Mr. Woodward was on methamphetamine. Id. at ¶ 6. Officers Ford and Hill agree that when they encountered plaintiff on Long Hollow Pike, he was "geeking out," a term which both officers defined as encompassing behaviors associated with being "on drugs or coming off drugs." (Docket Entry No. 85-4 at 28; Docket Entry No. 85-5 at 51) After speaking with Mrs. Rutter, Sergeant Shockley, the ranking officer on the scene, authorized the arrest of Mr. Woodward for filing a false police report; he radioed the officers outside the house to secure Mr. Woodward in their custody. The officers outside determined that Mr. Woodward should be moved from Officer Ford's car to the car of Officer James Perry, in order that Officer Perry could transport Mr. Woodward to the Sumner County Jail. (Docket Entry No. 77 at 5)

Before taking Mr. Woodward out of Officer Ford's vehicle, Officer Hill handcuffed him in the backseat, and Mr. Woodward allowed himself to be handcuffed. (Docket Entry No. 86 at ¶ 8) Up to the point where Mr. Woodward was handcuffed by Officer Hill, he had not shown any aggression or been violent with the officers, but had been compliant despite having been "geeking out" at the roadside encounter with the officers. Id. at ¶ 9.

The events that followed Mr. Woodward's removal from Officer Ford's vehicle are depicted on the audio and video recording made from Officer Ford's dashboard camera.

4

(Docket Entry No. 72, att.)  After removing Mr. Woodward from Officer Ford's vehicle, Officers Hill and Perry walked Mr. Woodward over to the front end of Officer Perry's vehicle, where Officer Perry attempted to search his pockets for contraband.  Mr. Woodward had repeatedly asked to be taken to the Gallatin police, and was informed by the officers that they were Gallatin police officers.  When Officer Perry attempted to search the pocket of Mr. Woodward's shorts, Mr. Woodward accused Officer Perry of putting something in his pocket.  He repeated this accusation several times and pleaded with Officer Hill to check his pocket and remove what he believed to have been put there by Officer Perry, becoming agitated, raising his voice, and jostling against his restraint by the officers.  Officers Perry and Hill both repeatedly advised Mr. Woodward to "relax" and to "chill out" to no avail, until Officer Hill warned Mr. Woodward to "chill out or you're gonna get tased."  Mr. Woodward momentarily calmed down, before he once again began struggling against his restraint by the officers, while shouting "Gallatin police!" and "I'm going to Gallatin!"  At that point, Mr. Woodward jostled free of his restraint by Officer Perry and turned away from the officers.  Officer Hill thereupon deployed his taser in "probe mode," aimed at Mr. Woodward's back.  Mr. Woodward cried out in apparent pain and fell to the ground, rolling from the roadside into the grass of a drainage ditch, where he was commanded by the officers to get on his stomach.  Instead, Mr. Woodward rolled until he could regain his footing, then ran a short distance to Officer Hill's vehicle, still demanding to be taken to the Gallatin police.  During the seconds that it took Mr. Woodward to regain his footing and begin moving toward Officer Hill's vehicle, there were other taser deployments, which did not appear to have any effect on Mr. Woodward.  (Docket Entry No. 72, att.)  According to the taser download reports, Officer Hill deployed his taser four times within a span of one

minute during the arrest, depressing the trigger for five, six, six, and five seconds respectively. Officer Perry deployed his taser once, depressing the trigger for five seconds. (Docket Entry No. 86 at ¶ 15)

Mr. Woodward jumped on the hood of Officer Hill's vehicle (in which the police dog Alex was contained), and then rolled off the side of the hood when the officers arrived at the vehicle. After Mr. Woodward fell off the hood, Officers Hill and Perry both used their Tasers in drive-stun mode, but were not able to subdue him. During the altercation on the hood of and directly beside the K9 vehicle, the police dog, Alex, exited the vehicle without command and bit Mr. Woodward on the leg. Alex had never before exited the K9 vehicle without being commanded to do so. (Docket Entry No. 86 at ¶¶ 16-17) Officer Hill commanded Alex to release Mr. Woodward, and subsequently called for Emergency Medical Services. Because Mr. Woodward continued to kick at the officers, leg restraints were applied to Mr. Woodward. After the officers put leg restraints on Mr. Woodward, he started banging his head against the pavement, so they moved him to a roadside yard. Within minutes, EMS arrived. Id. at ¶¶ 19-20. Mr. Woodward suffered cardiopulmonary arrest on the way to the hospital, and was pronounced dead at 11:18 p.m. on October 27, 2009. (Docket Entry No. 82-9)

At all relevant times, all City of Gallatin police officers had received the extensive training regimen described by Lt. Vahldiek in his affidavit (Docket Entry No. 84-2), which is incorporated herein by reference. Many officers, including Officers Perry, Hill, and Shockley, routinely took advantage of the City's willingness to pay for and send them to additional training courses. The April 2009 in-service training all Gallatin police officers received included instruction through TASER training program version 14, the most current

version of TASER training then available. TASER training version 14 included general information on the risk of sudden death and excited delirium, as well as specific examples of cases of excited delirium captured on video in Texas and Florida. (Docket Entry No. 86 at ¶¶26-30; Docket Entry No. 83-1 at 11-21) When the Gallatin Police Department's General Order on "Use of Force and Weapons" -- which includes a subsection on the appropriate use of the X26 Taser (Docket Entry No. 75-3 at 11-13) -- was reviewed by the Commission on Accreditation for Law Enforcement Agencies (CALEA), it was determined to be in compliance with CALEA standards, which are set by a nationwide, best-practices model. (Docket Entry No. 86 at ¶ 34)

## III. Conclusions of Law

### A. <u>Summary Judgment Standard</u>

Rule 56(c)(2) of the Federal Rules of Civil Procedure provides that summary judgment should be rendered if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." In determining whether the movant has met its burden, the court must view the evidence in the light most favorable to the non-moving party. <u>Matsushita Electric Indus. Co. v. Zenith Radio Corp.</u>, 106 S.Ct. 1348, 1356 (1986). In order to defeat the motion, the non-moving party may not merely rest on conclusory allegations contained in the complaint, <u>Celotex Corp. v. Catrett</u>, 106 S.Ct. 2548, 2553 (1986), but must affirmatively demonstrate "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S.Ct. 2505, 2511 (1986).

B.  Analysis of the Motion

As previously noted, the sole remaining defendant in this civil rights action is the City of Gallatin.  The Court will assume without deciding that the underlying use of force by the individual officers was excessive in violation of Mr. Woodward's Fourth Amendment rights.  However, municipal liability pursuant to 42 U.S.C. § 1983 depends on plaintiffs' ability to show that an official policy or unofficial custom of the City actually caused the alleged constitutional harm; municipalities cannot be held vicariously liable under § 1983 for the wrongdoing of their agents under the theory of *respondeat superior*. See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 690-95 (1978).  Accordingly, the inquiry in such cases is directed not to the constitutional torts of municipal agents which varied from official policy or custom, but to the extent that such wrongful actions were taken in furtherance of official policy or custom, such that "it can be fairly said that the city itself is the wrongdoer."  Collins v. City of Harker Heights, Tex., 503 U.S. 115, 122 (1992). The Sixth Circuit has explained that "to satisfy the Monell requirements a plaintiff must 'identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.'"  Garner v. Memphis Police Dept., 8 F.3d 358, 364 (6th Cir. 1993) (quoting Coogan v. City of Wixom, 820 F.2d 170, 176 (6th Cir. 1987)).

Municipal policy begetting § 1983 liability may arise from a failure to train or supervise city police officers, but "[o]nly where [such] failure to train in a relevant respect evidences a 'deliberate indifference' to the rights of [the city's] inhabitants[.]"  City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989).  The Sixth Circuit has applied this rule

8

using a three-part test to determine the viability of a failure-to-train claim.  See Ellis v. Cleveland Mun. School Dist., 455 F.3d 690, 700 (6th Cir. 2006).  "To succeed on a failure to train or supervise claim, the plaintiff must prove the following:  (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury."  Id. (citing Russo v. City of Cincinnati, 953 F.2d 1036, 1046 (6th Cir. 1992)).

As to the first element above, plaintiffs claim that the City did not provide adequate training in the "appropriate handling by its police officers of persons in the same or similar circumstances as Jeffery Woodward."  (Docket Entry No. 1-1 at ¶¶ 29, 39)  In response to defendant's showing of the breadth and depth of training it provides its officers, including training on the use of tasers and other instruments along its use-of-force continuum, as well as the policies governing such uses of force, plaintiffs offer the following:

> Defendant devotes a great deal of time arguing about whether the Gallatin Police Department's training was adequate in regard to Tasers, Use of Force, and K-9's.  However, they devote very little space to the real issue:  Gallatin's lack of training in dealing with mentally ill and emotionally disturbed individuals.  It was the lack of training in dealing with individuals such as Jeffery Woodward that resulted in the inappropriate use of force and unnecessary taser applications.  [It was] [t]he lack of training in regard to dealing with excited delirium and in custody deaths that was the driving force behind Mr. Woodward's death.

(Docket Entry No. 87 at 5)  It is not disputed that Gallatin police officers are frequently called upon to interact with people who are impaired in some way.  However,  there is no evidence to suggest that these officers are routinely called upon to intervene with people suffering from excited delirium.  In support of their theory of liability, plaintiffs offer the

expert report of Mr. Ernest Burwell. (Docket Entry No. 84-9) Mr. Burwell opines as follows:

> The officers should have been trained to immediately recognize the signs and symptoms of mental illness and to immediately notify medical personnel before taking any action to attempt to apprehend such a suspect unless absolutely necessary.
>
> . . .
>
> [The] officers who were on scene, failed to recognize Mr. Woodward was in great need of medical assistance before and after a lengthy struggle . . . . EMS should have been called before attempting to take Mr. Woodward into custody. . . . The Police Department failed to properly train their officers regarding what to observe and how to handle persons in a mental crisis.
>
> . . .
>
> [Mrs. Rutter] gave the officers information her son, Mr. Woodward, was delusional, and under the influence of methamphetamines. With that information the officers should have called medical personnel immediately. Instead they were arresting Mr. Woodward for filing a false police report. They never recognized his symptoms were that of a medical emergency and they never recognized the potential for an in custody death, nor to get necessary medical attention at this point.

Id. at 7, 14-15.

Assuming without deciding that Mr. Burwell is qualified to give such expert testimony, and that such testimony is otherwise reliable, the Court finds this testimony insufficient as a matter of law to establish a triable issue of inadequate training in this case, based on the undisputed facts in evidence. In support of its summary judgment motion, the City made a showing of the extensive training it provides its officers, including initial training and department certification on the use of tasers, and annual recertification training on taser use. (Docket Entry No. 84-2 at ¶¶ 8, 14-15) The TASER recertification training for 2009, which was administered by the City prior to the incident in question, included training

on excited delirium syndrome, the specific illness at issue here.  (Docket Entry No. 83-1 at 13-20)  As read into the record of Officer Ford's deposition (Docket Entry No. 85-5 at 62-63), this recertification program included the following pertinent training:  "Should one or more of the following behaviors manifest, the suspect may require immediate medical assistance due to preexisting conditions, possible overdose, cocaine psychosis, excited delirium, et cetera.  Consider having EMS standing by.  Bizarre or violent behavior, signs of overheating/profuse sweating, disrobing, violence toward/attacking glass, lights, and reflective surfaces, superhuman strength and endurance, impervious to pain, self-mutilation, disturbances in breathing patterns or loss of consciousness, complaints of respiratory difficulty."  Excited delirium was defined in the recertification presentation as "a state of extreme mental and physiological excitement, characterized by extreme agitation, hyperthermia, hostility, exceptional strength and endurance without apparent fatigue," and was equated with "in-custody death syndrome."  Id. at 64.  Officer Ford recalled this training, and testified that Mr. Woodward was not exhibiting any such signs that should have prompted a call for emergency medical care during his interaction with Mr. Woodward on the side of the road on Long Hollow Pike, or during the ride to Trousdale Avenue in Officer Ford's patrol car.  Id. at 54, 63-66.

More generally, the annual in-service training for 2009, administered between April 6 and May 1, 2009, included "a detailed [3-hour] program administered by an individual named Richard Perdomo with Cumberland Mental Health regarding how police officers should recognize and respond effectively to people displaying symptoms of mental illness or a person exhibiting signs of emotional distress."  (Docket Entry No. 84-2 at ¶ 12; Docket Entry No. 84-4 (program outline))  In attempting to rebut this showing and establish

a factual issue for trial, plaintiff has entirely failed to present any evidence of training in

other jurisdictions by which the inadequacy of Gallatin's training could be judged, or of

other cases within Gallatin where arrestees suffered from excited delirium or broader mental

illness, to underscore the theory that the level of training given these officers was

inadequate.  In their response brief, plaintiffs merely cite the frequency with which police

officers have to deal with "emotionally disturbed" people, and then conclude that "[d]espite

this fact, the City of Gallatin has done very little to educate officers regarding the excited

delirium."  (Docket Entry No. 87 at 6-7)  Essentially then, the only proof supporting

plaintiffs' theory of inadequate training is Burwell's report, in which he basically opines that

the officers' actions in this case were indicative of a lack of training, without identifying any

deficiencies in the Gallatin training materials as compared with what he would identify as

appropriate training materials.  Such a showing is simply insufficient, as found by the court

in Davidson v. City of Statesville, 2012 WL 1441406 (W.D.N.C. Apr. 26, 2012).  The

Davidson court found as follows:

> Here, Plaintiff does little to address the training programs here at issue, instead
> choosing to discuss the conduct of the individual officers at length.  In doing
> so, Plaintiff suggests that because such conduct occurred, it follows that there
> must have been a defect in training.  However, presuming the individual
> officers' conduct to have violated Plaintiff's constitutional rights, this alone is
> generally inadequate to sustain a failure-to-train claim under section 1983.  A
> plaintiff must show a "direct causal link" between "a specific deficiency in
> training and the particular violation alleged." *Buffington v. Balt. County*, 913
> F.2d 113, 122 (4th Cir. 1990).  It will not "suffice to prove that an injury ...
> could have been avoided if an officer had had better or more training,
> sufficient to equip him to avoid the particular injury-causing conduct" because
> "[s]uch a claim could be made about almost any encounter [resulting in injury,
> yet not condemn the adequacy of the program to enable officers to respond
> properly to the usual and recurring situations with which they must deal.  And
> plainly, adequately trained officers occasionally make mistakes; the fact that

they do says little about the training program or the legal basis for holding the city liable.]" <u>Harris</u>, 489 U.S. at 391.

<u>Id.</u> at *5.

The Court is mindful of the Sixth Circuit's decision in <u>Russo v. City of Cincinnati</u>, but finds it distinguishable from the instant case on a number of fronts. In <u>Russo</u>, the court reviewed and found sufficient the plaintiff's evidence opposing the municipality's summary judgment motion, which included the following conclusions of a police procedures expert on the training given to officers on the use of force on mentally disturbed persons:

> [N]one of the involved police personnel understood the appropriate procedures for reacting to mentally ill individuals, ... a failing which must inevitably be linked to deficient training. Notwithstanding the apparent fact that Sergeant Sizemore as well as Officers Lemker and Scholl had nominally received such training from the available case records, the conclusion is ineluctable that it was not of such a nature as would assure a proper understanding and appropriate response to a situation of this sort.

953 F.2d 1036, 1047 (6th Cir. 1992). Conclusory though this opinion may be, the <u>Russo</u> court rejected the city's argument that it was entitled to no weight, instead highlighting the value of expert testimony "[e]specially in the context of a failure to train claim, [where] expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of a municipality's training procedures." <u>Id.</u> The court went on to find a genuine issue of material fact for trial despite the city's offering to its officers a seven-hour course on interaction with mentally disturbed individuals, because the city offered no proof as to the content of that course, but only the fact that the officers had attended it, and thus the city had not refuted the expert's conclusion that the content of the training offered was inadequate. <u>Id.</u>

Conversely, in the case at bar, the City has offered into evidence the outline of the training courses it provided its officers on the topics of dealing with mentally ill persons, and recognizing and responding to the signs and symptoms of excited delirium, as well as deposition and affidavit testimony from its training coordinator during the relevant period, Lt. Vahldiek. Moreover, this case lacks the additional factor which influenced the decision in Russo, namely, a report from an independent municipal investigation concluding that "recruit training regarding the mentally ill appears inadequate, [and] in-service training is virtually non-existent. . . ." Id. at 1046. Indeed, the Russo panel was a fractured one, with the concurring opinion finding the expert's report insufficient in and of itself to oppose summary judgment, but agreeing with the result reached by the lead opinion on the added strength of the independent investigator's report of inadequate training. Id. at 1048-49. The third panel member dissented with respect to the claim of failure to train, finding both the expert report and the independent investigation report to be of no evidentiary value since they focus only on the allegedly offending officers and what they knew or did not know, rather than the training program itself, its content and the manner in which it was administered. Id. at 1049-51. See also Abdi v. Karnes, 556 F.Supp.2d 804, 8114 (S.D. Ohio 2008) (discussing Russo and subsequent cases which "provide a more focused and narrow interpretation of the decision in Russo.").

Finally, this case is distinguishable from Russo in that Russo involved the content of municipal training on the use of force against people who are known to be mentally ill, i.e., the decedent in Russo was a paranoid schizophrenic who had essentially escaped his residential treatment facility and was reported by that facility to the police. This distinction has been applied to the determination of the reasonableness of the use of force in

the Fourth Amendment context, <u>Gaddis ex rel. Gaddis v. Redford Twp.</u>, 364 F.3d 763, 775 (6th Cir. 2004) (distinguishing the case from <u>Russo</u> because the officer "had only fragmentary evidence that Gaddis was mentally disturbed"), and is no less notable in the failure-to-train context. Indeed, there is simply no evidence that Mr. Woodward was exhibiting signs and symptoms of excited delirium, as opposed to simple intoxication from the use of methamphetamine, at any time prior to Officer Perry's attempt to search him incident to arrest and the escalation of events which followed. While Mr. Woodward was plainly anxious and upset ("geeking out") when Officers Hill and Ford encountered him on Long Hollow Pike, his condition was not deemed inconsistent with the report of his mother being held hostage, and at that point he was compliant and calm enough to be taken, without being restrained, to the scene on Trousdale Avenue in the back of the Officer Ford's car, and left there while his mother was interviewed. Even when plaintiff was handcuffed while still in the police car, and then -- as depicted in the video -- subsequently removed from Officer Ford's car and walked up to the front end of Officer Perry's car, he was to all appearances calm and compliant. Other than being out of touch with reality, there is no evidence to suggest that Mr. Woodward displayed any signs of excited delirium at any point prior to when he began resisting arrest. Cf. <u>Mann v. Taser Intern., Inc.</u>, 588 F.3d 1291, 1307-08 (11th Cir. 2009) ("Prior to her death, Melinda's behavior did not indicate that she had a serious medical need. Her physical resistance and verbal communication suggested to the deputies that although agitated, Melinda was not in immediate medical danger. ... The Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol. There is no evidence that indicates Melinda's behavior evidenced a serious disease [of excited delirium] rather than a

temporary reaction to the known use of methamphetamine.").  Once the altercation escalated and more signs of excited delirium manifested when force was applied to him, resulting in the need for medical intervention, it certainly does not appear that medical assistance could have been summoned any earlier than it was, in light of all the circumstances.

In short, the Court finds that, viewing the record in the light most favorable to plaintiffs, they have failed to adduce sufficient evidence to create a genuine issue of material fact regarding the inadequacy of the training provided by the City to its police officers, much less that any such inadequacy was the result of deliberate indifference on the part of the City.  To be sure, with the benefit of hindsight, the officers' decision to remove Mr. Woodward from Officer Ford's patrol car after securing him in handcuffs was regrettable. However, there is simply a failure of proof in support of plaintiffs' claim that the individual officers' interactions with Mr. Woodward were improper due to deficient training by the City, and that such deficiency in training was maintained despite a glaringly obvious need for further instruction on interacting with people whose mental status is altered due to the effects of drug use, excited delirium, or other mental illness, such that a reasonable juror could find the City deliberately indifferent.  Plaintiffs did not contest the City's arguments in support of summary judgment on their claims of deliberately indifferent supervision and violation of Mr. Woodward's Fourteenth Amendment right to prompt medical attention to his serious medical needs.

Moreover, aside from proclaiming that "[i]n the history of the Gallatin Police Department, not a single officer  has ever been disciplined for using excessive force against a suspect" (Docket Entry No. 87 at 8), and citing deposition testimony from  three officials to

the effect that they could not recall any specific instance where an officer had been found to have used excessive force against a suspect, id. at 9, plaintiffs have only offered Mr. Burwell's opinion -- that Mr. Woodward's treatment was motivated by the fact that the City had no policy or procedure in place to monitor the use of force and to discipline officers whey they use excessive force -- in support of their claim that the City had a custom of ignoring or condoning its officers' use of excessive force.  Such claims, however, require more evidence to survive summary judgment than the conclusion of an expert based on that expert's opinion as to causation.  Such claims require proof of other incidents of excessive force sufficient to show  a clear and persistent pattern of illegal activity which the City knew or should have known about, yet remained deliberately indifferent to, such that the custom of ignoring such uses of force can be deemed to have caused the excessive use of force in this case.  Thomas v. City of Chattanooga, 398 F.3d 426, 433 (6th Cir. 2005) (citing Doe v. Claiborne County, 103 F3d 495, 508 (6th Cir. 1996); see also Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985).  Whereas defendant has put on evidence of its policy regarding use of force and testimony to support general departmental compliance with this policy, plaintiffs rely upon their expert's finding that Gallatin appears to have no have no policy or procedure in place to monitor use of force and to discipline officers for their use of excessive force, in order to establish a triable issue as to whether the City has a custom of deliberate indifference to its officers' proper application of the use of force policy.  More is required to successfully oppose summary judgment on this claim, as noted above.  See Thomas, 398 F.3d at 432-34 (rejecting conclusory opinion of police practices expert as insufficient to create fact issue on which a jury could reasonably find for plaintiff, where that opinion amounts to inference without supporting references to other incidents of unconstitutional conduct).

Lastly, in view of the dismissal of all federal claims, plaintiffs' state law claim against the City under the Tennessee Governmental Tort Liability Act (GTLA), Tenn. Code Ann. § 29-21-101 et seq., is subject to dismissal without prejudice. While both parties now argue for the Court's retention of supplemental jurisdiction over this claim, the City initially and correctly noted that the GTLA contains an exclusivity provision, which states that "[t]he circuit courts shall have exclusive original jurisdiction over any action brought under this chapter and shall hear and decide such suits without the intervention of a jury, except as otherwise provided in § 29-20-313(b)...." Tenn. Code Ann. § 29-20-307.

Title 28, section 1367 of the United States Code provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). This statute codified the principles set forth in United Mine Workers of Am. v. Gibbs, 383 U.S. 715 (1966), wherein the Supreme Court held that jurisdiction over a pendent state law claim is proper only when that claim and the federal claim(s) over which the court has original jurisdiction "derive from a common nucleus of operative fact," and are so closely related that the plaintiff "would ordinarily be expected to try all of them in one judicial proceeding." Gibbs, 383 U.S. at 725. However, even in the presence of such a close relationship, § 1367 goes on to allow that the exercise of supplemental jurisdiction is a matter of the court's discretion, as follows:

(c)  The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1)  the claim raises a novel or complex issue of State law,

(2)  the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)  the district court has dismissed all claims over which it has original jurisdiction, or

(4)  in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

Depending on a host of factors, then—including the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims—district courts may decline to exercise jurisdiction over supplemental state law claims. The statute thereby reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity."

City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 173 (1997) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)).

Both this Court and the Sixth Circuit have repeatedly held that the Tennessee legislature's "unequivocal preference" that GTLA claims be adjudicated in the circuit courts of the state is an exceptional circumstance justifying the district court's decision to decline supplemental jurisdiction, pursuant to § 1367(c)(4).  E.g., Gregory v. Shelby Co., Tenn., 220 F.3d 433, 446 (6th Cir. 2000), abrogated in part by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598 (2001), as stated in DiLaura v. Twp. of Ann Arbor, 471 F.3d 666, 671 n.2 (6th Cir. 2006); Bluedorn v. Wojnarek, 2008 WL 4791540, at *12 (M.D. Tenn. Oct. 29, 2008) (citing cases).  The Court finds no reason to stray from this precedent here, where plaintiffs seek to impose liability upon the City based on the alleged

negligence of the City itself, in addition to the negligence of its employee police officers, pursuant to a statutory removal of immunity that is to be strictly construed given its enactment in derogation of the state's common law, <u>Limbaugh v. Coffee Med. Center</u>, 59 S.W.3d 73, 83 (Tenn. 2001), despite the possible exception to this removal of immunity under the statute for injuries "aris[ing] out of … civil rights," Tenn. Code Ann. § 29-20-205(2).  Though it has been argued that the interests of judicial economy and fairness would be served by retaining jurisdiction over plaintiffs' state law claims, the Court finds that the time, money, and effort expended in this federal litigation would not be wasted if plaintiffs decide to pursue these claims in state court, and in any event, the dismissal of all claims within this Court's original jurisdiction combine with the exceptional circumstances noted above to weigh in favor of declining supplemental jurisdiction in this case.

## IV.  Conclusion

In light of the foregoing, the Court finds the City's motion for summary judgment well taken.  That motion will be granted, and plaintiffs' federal claims will be dismissed with prejudice, while their state claims will be dismissed without prejudice to refiling in state court.  The City's motion to ascertain status will be granted, and all other pending motions will be denied as moot.

An appropriate Order will enter.

**ENTERED** this 19th day of November, 2013.

_s/ John S. Bryant_
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE